**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| PRINTERON INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-13-3025 |
| | § | |
| BREEZYPRINT CORP., *et al*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION ON CLAIM CONSTRUCTION AND ON SUMMARY
JUDGMENT, SANCTIONS, AND RELATED MOTIONS**

This patent infringement case involves computer technology for printing on remote devices.

Computer users in the 1990s and early 2000s had to download and install drivers before performing

most tasks, including printing. In 2000, PrinterOn obtained two patents for automating the driver-

download process for network printing and two patents for controlling user access to servers and

printers. Although computer users still need devices with drivers under PrinterOn's patents, the

drivers need not be manually downloaded and installed. Progress for the users, and benefits for

PrinterOn, whose monopoly made it the leading enterprise-grade printing software company in the

world.

Progress has continued. A small company in Northern California called BreezyPrint has

introduced and marketed a printing system that does not require installing or downloading drivers

on end-user devices, whether manually or automatically, to translate data to printer-friendly formats.

Instead, BreezyPrint's system moves the data-translation process to the cloud. BreezyPrint's system

also allows users to preauthorize the use of a printer in the user's network.

BreezyPrint's new system has gained market share. Uniguest, a company that provides print, technology, and other specialized services for the hospitality industry, entered into a contract with BreezyPrint under which BreezyPrint would supply Uniguest's printing needs. BreezyPrint has become a kind of early Apple to PrinterOn's Microsoft, a new Google to PrinterOn's AskJeeves. PrinterOn sued both BreezyPrint and Uniguest for infringement, seeking damages and an injunction. After PrinterOn settled with Uniguest, and Uniguest ended its BreezyPrint contract, BreezyPrint counterclaimed against PrinterOn for tortiously interfering with the Uniguest contract.

The parties have presented competing claim constructions and asked the court to resolve the disputed terms. BreezyPrint has moved for summary judgment that it does not infringe any of PrinterOn's patents, a declaratory judgment that PrinterOn's patents are invalid, and sanctions against PrinterOn's attorneys for failing to adequately investigate before filing this suit and for making frivolous arguments about the scope of its patents. PrinterOn has cross-moved for summary judgment that BreezyPrint's tortious-interference counterclaim and unclean-hands defense both fail as a matter of law.

Based on the pleadings, the motions, the briefs, the record, the hearings, the arguments of counsel, and the applicable law, the court:

1.  construes the disputed claim terms;
2.  grants BreezyPrint's motions for summary judgment of noninfringement, (Docket Entry Nos. 32, 37);
3.  grants PrinterOn's motion for summary judgment dismissing BreezyPrint's tortious-interference counterclaim, (Docket Entry No. 103);
4.  denies BreezyPrint's motion for sanctions, (Docket Entry No. 152);
5.  denies PrinterOn's motion for leave to file a surresponse, (Docket Entry No. 185); and
6.  denies as moot BreezyPrint's motion for summary judgment for invalidity, (Docket Entry No. 109), PrinterOn's motion for summary judgment on BreezyPrint's unclean-hands defense, (Docket Entry No. 99), and

BreezyPrint's motion to defer a decision on that motion, (Docket Entry No. 101).

By **March 27, 2015**, the parties must either: (a) file a statement identifying any issues that remain to be resolved and a proposed schedule for doing so; or (b) submit a proposed form of final judgment.

The reasons for these rulings are explained below.

## I.    Background

Both PrinterOn and BreezyPrint design and sell mobile-printing services to print files from such devices as smartphones and tablets.  PrinterOn, a Canadian company, holds several patents dating back to the late 1990s.  PrinterOn uses cloud technology to enable users to print documents sent from a smartphone, tablet, or other computing device to a PrinterOn-enabled printer where it is located.  PrinterOn's technology has been used in over 10,000 printing locations in more than 120 countries.

PrinterOn's patents teach a system and method for a "network terminal" (such as an iPhone or iPad) to use "resource driver" software to translate the data the user wants to print into a printer-friendly format, and then to communicate that translated data to a "network resource device," such as a printer or fax machine.  Under PrinterOn's system, the printing cannot occur unless the printer receives a recognized authorization password.

BreezyPrint, a mobile-printing start-up in the Bay Area, uses a similar system with differences.  In May 2009, the founder of what became BreezyPrint, Jared Hansen, had an idea for improving mobile printing.  He outlined the idea—quaintly enough, using a pen and paper—and listed four advantages.  One advantage was the absence of the "need for *any* printer driver on [the]

handheld device." (Docket Entry No. 32, Hansen Decl., Ex. 1 (emphasis original)).  As a result, the "software for [the] device can be very lightweight." (*Id.*).  Hansen founded BreezyPrint a few months later. (*Id.* ¶ 4).

BreezyPrint's system does not require drivers or authorization passwords at the user level. Instead, BreezyPrint allows users to send untranslated data from their mobile devices, such as an iPhone or tablet, through its own cloud server, the "Breezy Cloud."  The Breezy Cloud translates the user's data into printer-friendly format.  The Breezy Cloud then sends the printable material across a firewall to another server, the "Breezy Connector," which transmits the material to printers that have been preauthorized for the user.

Uniguest provides streamlined technological solutions for the hospitality industry.  When this lawsuit was filed, the company had "more systems deployed and five-star relationships with every major hospitality brand than any other provider in the industry." (Docket Entry No. 120, at 2). Uniguest has more than 14,000 placements "for more than 8,000 clients covering 40 countries." (*Id.*).  Uniguest expected its systems to be used by "every Hilton brand and property by 2015," which would cover "nearly 50% of the highly sought after full-service segment of the U.S. hospitality industry." (*Id.*).

In November 2012, after discussions about selling a jointly developed printing product for the hospitality industry, BreezyPrint signed a contract to develop a printing product for Uniguest. (Docket Entry No. 120, at 3).  Under the contract, BreezyPrint would provide its mobile-printing services to more than 8,000 Uniguest customer sites in exchange for licensing revenue.  Uniguest began promoting BreezyPrint over PrinterOn with its customer hotels.  PrinterOn began to lose its industry dominance.  In October 2013, PrinterOn filed this suit.

4

PrinterOn alleges willful infringement (direct, inducing, and contributing) of four patents, U.S. Patent Nos. 6,990,527 ('527), 7,007,093 ('093), 7,249,188 ('188), and 7,827,293 ('293). (Docket Entry No. 1).  The '527 and the '093 Patents—the "Driver Patents"—address PrinterOn's system and method for using drivers to translate data into printer-ready format.  The '188 and '293 Patents—the "Password" or "Polling Patents"—cover PrinterOn's system and method for polling queued print jobs outside the firewall and allowing them inside the firewall only if the user has obtained and submits an authorization password.

Before BreezyPrint filed an answer, PrinterOn dismissed its claims against Uniguest, without prejudice.  *See* FED. R. CIV. P. 41(a)(1)(A)(I); (Docket Entry No. 6).  BreezyPrint asserted defenses of noninfringement, unclean hands, invalidity, patent exhaustion, laches, and government sale. BreezyPrint also counterclaimed for a declaratory judgment of noninfringement and invalidity, and for damages based on PrinterOn's alleged tortious interference with the Uniguest contract.  (Docket Entry Nos. 13, 143).

In June 2014, before the scheduled completion of discovery (but after allowing PrinterOn to review its source code), BreezyPrint moved for summary judgment that it did not infringe any of the four patents.  (Docket Entry Nos. 32, 37).  The parties submitted competing claim constructions. The court held a two-day claim-construction hearing in November 2014, to consider the parties' disputed constructions under *Markman v. Westview Instruments*, 52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).

The following motions are pending:

- BreezyPrint's motion for summary judgment that it does not infringe the Driver Patents (Docket Entry No. 32);

- BreezyPrint's motion for summary judgment that it does not infringe the Polling-Password Patents (Docket Entry No. 37);

- PrinterOn's motion for summary judgment on BreezyPrint's unclean-hands affirmative defense (Docket Entry No. 99);

- BreezyPrint's motion to defer response and decision on PrinterOn's motion for summary judgment on BreezyPrint's unclean-hands defense, including BreezyPrint's request to compel production of the G. Tisdall emails (Docket Entry No. 101);

- PrinterOn's motion for summary judgment on BreezyPrint's tortious interference counterclaim (Docket Entry No. 103);

- BreezyPrint's motion for summary judgment that the four patents are invalid (Docket Entry No. 109);

- BreezyPrint's motion for sanctions (Docket Entry No. 152); and

- PrinterOn's motion for leave to file a supplemental response in opposition to BreezyPrint's motion for sanctions (Docket Entry No. 185)

The court heard oral argument on the motions. The first part of this opinion construes the disputed claim terms. The second part analyzes the summary judgment, sanctions, and related motions.

## II.    The Applicable Legal Standards

### A.    Claim Construction

The "'claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). "[T]he construction of a patent, including terms of art within its claim, is exclusively within the province of the court." *Markman*, 517 U.S. at 372. Claim terms are "'generally given their ordinary

and customary meaning,'" which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312–13 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). A court is to read the patent from the vantage of a person with ordinary skill in the art at the time of the invention. *Phillips*, 415 F.3d at 1313. Such a person "'is deemed to read the words used in the patent documents with an understanding of their meaning in the field, and to have knowledge of any special meaning and usage in the field.'" *Id.* (quoting *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998)); *see also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) (cautioning courts not to interpret claim terms "in a vacuum" (quotation omitted)).

When the ordinary meaning is readily apparent, claim construction "involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. If this ordinary meaning is not clear, the court reviews "the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Vitronics*, 90 F.3d at 1582; *see also Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1331 (Fed. Cir. 2011) ("[T]he role of a district court in construing claims is . . . to give meaning to the limitations actually contained in the claims, informed by the written description, the prosecution history if in evidence, and any relevant extrinsic evidence.").

The court first looks "to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention." *Vitronics*, 90 F.3d at 1582. Claim terms must be construed in context of surrounding claim language. *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003) ("[T]he context of the surrounding words of the claim also must be considered

in determining the ordinary and customary meaning of those terms."); *accord Lexion Medical, LLC v. Northgate Techs., Inc.*, 641 F.3d 1352, 1356 (Fed. Cir. 2011).

Courts review the "specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning." *Vitronics*, 90 F.3d at 1582. The Federal Circuit has repeatedly stated that "claims 'must be read in view of the specification, of which they are a part.'" *Phillips*, 415 F.3d at 1315 (quoting *Markman*, 52 F.3d 967, 979 (Fed. Cir. 1995)). The specification, a "concordance for the claims," *id.* (quoting *Autogiro Co. of Am. v. United States*, 384 F.2d 391, 397–98 (Ct. Cl. 1967)), is the "best source for understanding a technical term," *id.* (quoting *Multiform Desiccants*, 133 F.3d at 1478). *See also Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1360 (Fed. Cir. 2004) ("In most cases, the best source for discerning the proper context of claim terms is the patent specification wherein the patent applicant describes the invention."). When the specification "reveal[s] a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. . . . the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316 (citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)). "In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor." *Id.* (citing *Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343–44 (Fed. Cir. 2001)); *see also Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (explaining that claim construction may deviate from the ordinary and customary meaning of a disputed term only if (1) a patentee sets out a definition and acts as his own lexicographer, or (2) the patentee disavows the full scope of a claim term either in the specification or during prosecution).

"'The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.'" *Phillips*, 415 F.3d at 1316 (quoting *Renishaw PLC v. Marposs Società per Azioni*, 158 F.3d, 1243, 1250 (Fed. Cir. 1998)). "There is a fine line between construing the claims in light of the specification and improperly importing a limitation from the specification into the claims." *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011). Courts must "capture the scope of the actual invention, rather than strictly limit the scope of claims to disclosed embodiments or allow the claim language to become divorced from what the specification conveys is the invention." *Id.*

"[A] court 'should also consider the patent's prosecution history, if it is in evidence.'" *Phillips*, 415 F.3d at 1317 (quoting *Markman*, 52 F.3d at 980). The prosecution history "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* (citing *Vitronics*, 90 F.3d at 1582–83); *see also Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1381 (Fed. Cir. 2011) ("[T]he specification is the primary source for determining what was invented and what is covered by the claims, elucidated if needed by the prosecution history."). The prosecution history includes "all express representations made by or on behalf of the applicant to the examiner to induce a patent grant, or . . . to reissue a patent. . . . includ[ing] amendments to the claims and arguments made to convince the examiner that the claimed invention meets the statutory requirements of novelty, utility, and nonobviousness." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985); *see also Sanofi-Aventis Deutschland GmbH v. Genentech, Inc.*, 473 F. App'x 885, 888 (Fed. Cir.

9

2012) ("We have held that an otherwise broadly defined term can be narrowed during prosecution through arguments made to distinguish prior art.") (citing *Phillips*, 415 F.3d at 1317 ("The prosecution history . . . consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent.")).

"The doctrine of prosecution disclaimer is well established in Supreme Court precedent, precluding patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003); *see also SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1286 (Fed. Cir. 2005). The doctrine applies even if the disclaimers were not necessary to make the invention patentable. *See Uship Intellectual Props., LLC v. United States*, 714 F.3d 1311, 1315 (Fed. Cir. 2013) ("We find no support for [the] proposition that prosecution disclaimer applies only when applicants attempt to overcome a claim rejection. Our cases broadly state that an applicant's statements to the PTO characterizing its invention may give rise to a prosecution disclaimer."); *cf. Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1583 (Fed. Cir. 1995) ("Estoppel extends beyond the basis of patentability . . . . Clear assertions made during prosecution in support of patentability, whether or not actually required to secure allowance of the claim, may also create an estoppel.") (citing *Tex. Instruments, Inc. v. U.S. Int'l Trade Comm'n*, 988 F.2d 1165 (Fed. Cir. 1993)).[1] The doctrine does

---

[1]  "There is a clear line of distinction between using the contents of the prosecution history to reach an understanding about disputed claim language and the doctrine of prosecution history estoppel which 'estops' or limits later expansion of the protection accorded by the claim to the patent owner under the doctrine of equivalents when the claims have been purposefully amended or distinguished over relevant prior art to give up scope. . . . [T]he two uses of the prosecution history must not be confused." *Biodex Corp. v. Loredan Biomedical, Inc.*, 946 F.2d 850, 862 (Fed. Cir. 1991) (citations and internal quotation marks omitted); *see also Ballard Med. Prods. v. Allegiance Healthcare Corp.*, 268 F.3d 1352, 1358–59 (Fed. Cir. 2001) (distinguishing the two); *Spectrum Int'l Corp. v. Sterilite Corp.*, 164 F.3d 1372, 1378 n.2 (Fed. Cir. 1998) (same). "Just as prosecution history estoppel may act to estop an equivalence argument under the

10

not apply "where the alleged disavowal of claim scope is ambiguous." *Omega Eng'g*, 334 F.3d at 1324; *see also id.* at 1325 ("[W]e have required the alleged disavowing statements to be both so clear as to show reasonable clarity and deliberateness and so unmistakable as to be unambiguous evidence of disclaimer.") (citations omitted).  Only when "the patentee has unequivocally disavowed a certain meaning to obtain his patent [does] the doctrine of prosecution disclaimer attach[ ] and narrow[ ] the ordinary meaning of the claim congruent with the scope of the surrender." *Id.* at 1324.

Courts may also "rely on extrinsic evidence, which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'" *Phillips*, 415 F.3d at 1317 (quoting *Markman*, 52 F.3d at 980).  Although extrinsic evidence "'can shed useful light on the relevant art,' it is 'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Zircon Corp. v. Stanley Black & Decker, Inc.*, 452 F. App'x 966, 972–73 (Fed. Cir. 2011) (quoting *Phillips*, 415 F.3d at 1317). Extrinsic evidence is "in general . . . less reliable than the patent and its prosecution history" because it is "not part of the patent" and was not created at the time of the patent's prosecution; "extrinsic publications may not be written by or for skilled artisans"; and expert reports and testimony created at the time of litigation may "suffer from bias not present in intrinsic evidence." *Phillips*, 415 F.3d

---

doctrine of equivalents, positions taken before the PTO may bar an inconsistent position on claim construction . . . ." *Ballard Med. Prods.*, 268 F.3d at 1359 (quoting *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1457 (Fed. Cir. 1998)) (alteration omitted).  When the accused infringer argues that the prosecution history results in a narrowing of a claim's scope, there is no difference, and the Federal Circuit has refused to reverse based on references to estoppel. *See id.* at 1359 ("Because the substance of the district court's analysis was sound, we disregard the fact that the court used the term 'prosecution history estoppel' in an unconventional manner."); *Biodex Corp.*, 946 F.2d at 862–63 (observing that "Biodex is technically correct in asserting that the doctrine of prosecution history estoppel is 'irrelevant' to determination of literal claim scope" but upholding the district court because prosecution history is relevant to claim interpretation) (citation omitted).

at 1318.  A court must exercise "sound discretion" in admitting and using extrinsic evidence.  *Id.* at 1319; *see also Seattle Box Co. v. Indus. Crating & Packing, Inc.*, 731 F.2d 818, 826 (Fed. Cir. 1984) ("A trial judge has sole discretion to decide whether or not he needs, or even just desires, an expert's assistance to understand a patent.  We will not disturb that discretionary decision except in the clearest case.").

"[E]xtrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Phillips*, 415 F.3d at 1319.  Although a court may consider extrinsic evidence, it must not relegate the intrinsic evidence to a mere "check on the dictionary meaning of a claim term." *Id.* at 1320–21 (noting that relying on dictionaries "too often" causes "the adoption of a dictionary definition entirely divorced from the context of the written description").  "The sequence of steps used by the judge in consulting various sources is not important; what matters is for the court to attach the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law." *Id.* at 1324 (citing *Vitronics*, 90 F.3d at 1582).

### B.    Summary Judgment

Summary judgment is appropriate if no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine [dispute] of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden "by 'showing'—that is, pointing out to the district court—that there is an absence of

evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. Although the party moving for summary judgment must demonstrate the absence of a genuine factual dispute, negating the elements of the nonmovant's case is not required. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (internal quotation marks omitted). "'If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response.'" *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam)).

When the moving party has met its Rule 56(a) burden, the nonmoving party cannot rest on its pleading allegations. The nonmovant must identify specific evidence in the record and explain how that evidence supports the claims. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary-judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

### C.   Patent Infringement

Patent infringement claims involve two analytic steps. *Mars, Inc. v. H.J. Heinz Co., L.P.*, 377 F.3d 1369, 1373 (Fed. Cir. 2004); *Scanner Tech. Corp. v. ICOS Vision Sys. Corp., N.V.*, 365 F.3d 1299, 1302 (Fed. Cir. 2004). The court first determines the meaning and scope of the asserted claims. *Scanner Tech.*, 365 F.3d at 1302; *Novartis Pharm. Corp. v. Eon Labs Mfg., Inc.*, 363 F.3d

1306, 1308 (Fed. Cir. 2004).  The court then compares the construed claims to the allegedly infringing method or product to determine whether the claims encompass the accused method or product.  *Bai*, 160 F.3d at 1353.

## III.    Claim Construction

PrinterOn alleges that BreezyPrint infringes the two Driver Patents, the '527 Patent and the '093 Patent, and the two Password or Polling Patents, the '188 Patent and the '293 Patent.  (Docket Entry No. 1).  All four patents stem from a senior Canadian Priority Application, but they do not incorporate that Application into either the claim terms or specification.[2]  The contents of the Priority Application are intrinsic evidence, like claim language, the specification, or prosecution history, but cannot alone support a particular construction.  *See Abbott Labs. v. Sandoz*, 566 F.3d 1282, 1289 (Fed. Cir. 2009) (affirming the district court's construction of "crystalline" as "Crystal A" "as outlined in the specification" despite the fact that "the Crystal B formulation actually appears in the parent . . . application" because "Abbott knew exactly how to describe and claim Crystal B compounds" yet "chose to claim only the A form in the [junior] patent"); *see id.* at 1290 ("[T]he rest of the intrinsic evidence, including the prosecution history and the priority [] application, evince[d] a clear intention to limit the [junior] patent to Crystal A as defined by the seven PXRD peaks in the specification and in claim 1."); *see also AIA Eng'g Ltd. v. Magotteaux Int'l S/A*, 657 F.3d 1264, 1279 (Fed Cir. 2011) (noting "that evidence proffered by [the patentee] regarding statements in the specification of one of the European priority applications is, at best, equivocal as to the meaning of" a disputed claim term and "does not alter the clear import of the claim language, specification, and

---

[2]  All four patents share the same specification.

relevant extrinsic evidence in this case" (citing *Abbott Labs*, 566 F.3d at 1290); *cf. Pfizer v. Ranbaxy Labs. Ltd.*, 457 F.3d 1284, 1290 (Fed. Cir. 2006) (observing that statements made during the prosecution of a foreign patent are irrelevant to claim construction).

The parties dispute the meaning of the following claim terms:

- "network terminal";

- "server";

- "resource driver";

- "network resource" and "network resource device";

- "configured with";

- "translated source data";

- "communication of translated source data";

- "for communication of translated source data from the network terminal to the network resource";

- "for facilitating communication between a network terminal and a selected network resource device over a network for communication of translated source data from the network terminal to the network resource device";

- "authorization password";

- "application data";

- "destination address";

- "decompress" and "decompression"; and

- "polling server."[3]

Because the claim constructions affect how infringement is analyzed, the competing constructions are addressed first, organized by the two categories of asserted patents.[4]

**A.   The Disputed Claim Terms in the Driver Patents (the '527 and '093 Patents)**

Each of the two Driver Patents includes two independent claims. One is a method claim, and one is system claim. All four of these independent claims have two relevant limitations: "determining the network terminal is configured with the resource driver"; and the "communication of translated source data from the network terminal to the network resource device." '527 Patent, 12:60, 13:36; '093 Patent, 13:1, 13:44. The '093 Patent includes another disputed limitation, "a degree of communication access." '093 Patent, 13:10.

**1.   "network terminal"**

The parties agree that "network terminal" encompasses many of the user devices familiar to electronics consumers. The parties dispute whether "network terminal" includes intermediary servers that do not belong to the end user. PrinterOn contends that it can; BreezyPrint argues that it cannot. PrinterOn proposes that "network terminal" be construed to mean "a computing device,

---

[3] The parties agree on the following constructions: "wit" ('527 Patent, Claim 5) means "with"; "administartor" ('093 Patent, Claim 3) means "administrator"; "updatabte ('188 Patent, Claim 10) means "updatable"; "decrypt/decrypting" ('293 Patent, Claims 1 and 21) mean "return[ing] to a pre-encrypted state"; "input interface" ('188 Patent, Claims 1 and 2) means "point in a process through which incoming information is passed"; and "output interface" ('188 Patent, Claims 1 and 2) means "point in a process through which outgoing information is passed." (Docket Entry No. 136, at 1); Markman Trans. at 185-86 (Nov. 4, 2014). The intrinsic evidence supports these constructions.

[4] The parties dispute two claim terms that are essentially typos and do not affect the pending motions: "polling sewer" ('188 Patent, Claim 14); and "as" ('188 Patent, Claim 12). (Docket Entry No. 136, at 10). Based on the intrinsic evidence, particularly the surrounding claim language, the court construes "sewer" to mean "server" and "as" to mean "is."

for example, smart phone, desktop computer, *or server*, capable of accessing a network resource over a communications network."  (Docket Entry No. 136, at 2 (emphasis added)).  BreezyPrint argues that "network terminal" should be construed to mean either:  (1) a "user device, such as a personal computer, a wireless-enabled personal data assistant, or an email-enabled wireless telephone that is capable of communicating over a network," (Docket Entry No. 136, at 2); or (2) a "device that originates the communication for the network resource," (Docket Entry No. 142, at 1).

Claim 1 of the '527 Patent describes a system comprising "an authorization *server* for receiving a request *from the network terminal* for communication access to the selected network resource device."  '527 Patent, 13:6-7 (emphasis added)).  Claim 1 of the '093 Patent contains a similar description, separately addressing an intermediary server and a network terminal.  '093 Patent, 13:17-20.  If "network terminal" included an intermediary server, such as the authorization server, this distinction in the same sentence would be unnecessary.  The claim language not only identifies these two system parts separately, it also describes the network terminal's role as originating and sending the request for access to the network resource device, which is again inconsistent with construing network terminal to include intermediary servers as opposed to only end-user devices. The specification supports this construction. The specification explains that, "[a]s shown in FIG. 2, the *network terminal comprises* a network interface, *a user interface*, and a data processing system in communication with the network interface and the *user interface*. . . . Preferably the *user interface* comprises a data entry device (such as keyboard, microphone, or writing tablet), and a display device (such as a CRT or LCD display)."  '527 Patent, 3:16-26

(emphasis added).  The preferred embodiment of the Driver Patents is a "network terminal" that includes a user device, or, at least, a device that originates the communication across a network.

PrinterOn argues that this construction improperly limits the term based on Figure 2, an illustrative example in the specification that shows an end-user device as a specific embodiment of a "network terminal."  (Docket Entry No. 106, at 7-8).  But the specification is not the only support for this construction.  The claim language, which distinguishes a network terminal from an intermediary authorization server, and the specification, which describes a preferred embodiment as an originating user device, both support this construction.  The specification confirms the claim term's ordinary meaning.  Neither the claim language nor the specification support PrinterOn's construction of network terminal to include an intermediary server.

PrinterOn argues that the "intrinsic evidence shows an embodiment of a network terminal . . . as a server" in the Canadian Priority Application.  This Application describes "wrapper layer software" that may "reside on an NT server" and wrap-around a driver.  (Docket Entry No. 106, at 8 (citing Priority Application § 3.5.1, 13:26-14:1)).  PrinterOn notes that the Priority Application refers to a "PrinterOn Driver on proxy server" and describes "perform[ing] the translation on the server," rather than on a user device, before sending "the print job to a printer."  (*Id.* (citing Priority Application, §§ 3.6, 14:12-30; 5.2.2, 26:28-35)).  But while the Priority Application is intrinsic evidence, the patent claim terms and specification offer no support for construing "network terminal" to include intermediary servers.  In the Priority Application, PrinterOn described an embodiment of a network terminal that encompassed intermediary servers, but PrinterOn did not do so when it in applied for the Driver and Password Patents.  *See Abbott Labs. v. Sandoz*, 566 F.3d 1282, 1289 (Fed. Cir. 2009) (affirming the district court's construction of "crystalline" as "Crystal

18

A" "as outlined in the specification" despite the fact that "the Crystal B formulation actually appears in the parent . . . application" because "Abbott knew exactly how to describe and claim Crystal B compounds" yet "chose to claim only the A form in the [junior] patent"). As BreezyPrint argued at the *Markman* hearing, PrinterOn "could have included [that disclosure] in their U.S. filings" but "made the conscious choice to leave [it] behind in Canada." Markman Trans. at 116 (Nov. 4, 2011). Although the Canadian Priority Application used the term "Network Terminal Server" and described an embodiment featuring translation on an intermediary server, the four asserted patents do not.[5]

PrinterOn's "wrapper layer" argument, based on the Canadian Priority Application, relies on a "chain of speculations inconsistent with the ordinary meaning and intrinsic evidence." (Docket Entry No. 119, at 11). PrinterOn's "wrapper layer" argument requires the following inferences: (1) the Canadian Priority Application describes that a network terminal may include "wrapper layer" software around an operating system printer driver; (2) the operating system printer driver around which the wrapper layer *may* be wrapped include Windows 95, 98, and NT print drivers; (3) a Windows NT print driver *may* run on a server version of Windows NT; so (4) a "network terminal" may be a server because it may include software that may wrap around a driver that may be capable of operation on a server. PrinterOn's effort to include an intermediary server in its definition of "network terminal" requires too many attenuated inferences that are inconsistent with the term's ordinary meaning and with the intrinsic evidence.

---

[5] PrinterOn argues that BreezyPrint should not be allowed to present this argument because it failed to raise it until the reply brief supporting summary judgment motion that PrinterOn's patents are invalid. (*See* Docket Entry No. 134, at 8). But BreezyPrint filed that brief before the parties submitted their joint claim construction chart and a week before the *Markman* hearing. (Docket Entry Nos. 136, 137-39). PrinterOn had notice of the argument and an adequate opportunity to respond.

PrinterOn's extrinsic evidence, which is entitled to less weight than the intrinsic evidence that existed when the patents issued, does not alter this construction.  PrinterOn's expert-witness report acknowledges that "all the myriad servers, firewalls, translations, etc. that make up the claimed inventions are *arrayed between those two points* [the network terminal at one end and the network resource at the other end]."  (Docket Entry No. 107-5, at ¶ 27 (emphasis added)); *see also* Markman Trans. at 15 (Nov. 4, 2014) ("The network terminal and network resource *frame the communications network*. . . ." (emphasis added)).  PrinterOn at times has made the same point.  (Docket Entry No. 106, at 9 ("At the one end of the communication is the network terminal which accesses a network resource at the other end.")).  PrinterOn argues that using these references to oppose its own proposed construction takes them out of context.  The context, however, is consistent with PrinterOn's statements.  The court's construction is also consistent with the ordinary meaning of the term "terminal."  It derives from the Latin word "*terminus*," meaning "boundary."  *See* WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 1217 (1990) (defining "terminal" as "of or relating to an end, extremity, boundary, or terminus" and as "a device (as a video display unit) by which data can enter or leave a communication network").

The court construes "network terminal" to mean "a device that originates the communication for the network resource."

## 2.   "server"

This term appears in all four patents.  PrinterOn argues that construction is unnecessary.  If the court disagrees, PrinterOn argues that "server" should be construed as "a service implemented by software."  (Docket Entry No. 136, at 3).  BreezyPrint argues that "server" should be construed

and that it means "software that receives a request from other software and provides a resource in response." (*Id.*).

PrinterOn argues that its proposed construction is consistent with the preferred embodiment disclosed in the specification, which identifies many servers based on their functions. (Docket Entry No. 106, at 25 (citing the "authorization server," "administration server," "print server," "polling server," "file server," "DNS (domain name server)," "enterprise server," "image server," and "local server")). BreezyPrint responds that its construction is consistent with the ordinary understanding of one skilled in the art of typical server "architecture," in which "client"[6] software sends a request to server software, and the server software responds to that request. (Docket Entry No. 119, at 18). BreezyPrint points to the use of "authorization server" and the "polling server" in the claim language as two examples. *See, e.g.*, '527 Patent, 13:6-7; '293 Patent, 12:62-63. BreezyPrint also contends that PrinterOn's proposed construction is overbroad because it makes "any software service running on a computer," including a calculator, a word processor, and an email program, "a 'server.'" (Docket Entry No. 119, at 18).

Although a "server" is a common term in the industry, it is one that needs construction to guide jurors. The court construes server to mean "software that receives a request from other software and provides a resource in response." This is consistent with the construction of other disputed claim terms and with the meaning one of ordinary skill in would give to the term. It also

---

[6] One dictionary defines "client" as a "computer in a network that uses the services (as access to files or shared peripherals) provided by a server." *See* WEBSTER'S ONLINE DICTIONARY, http://www.merriam-webster.com/dictionary/client.

avoids the overbreadth of PrinterOn's proposed construction, which does not distinguish between a server and other software services.

### 3.    "resource driver"

The parties dispute whether "resource driver" includes hardware or is limited to software. PrinterOn contends that "resource driver" means "software or hardware for converting data for processing by a network resource device." (Docket Entry No. 136, at 4). BreezyPrint asserts that it means "software for translating data to produce translated data in a format suitable for processing by a network resource device." (*Id.*).

The intrinsic evidence supports BreezyPrint's proposed construction. Claim 1 of the Driver Patents describes a "resource driver associated with the selected resource device" and a "resource driver for *translating* source data to produce the *translated* source data in a format suitable for processing by the network resource device." '527 Patent, 13:3-5 (emphasis added); '093 Patent, 13:14-16. This claim also describes an authorization server configured "for determining the network terminal is configured with the resource driver associated with the driver identifier." '527 Patent, 13:16-18; '093 Patent, 13:28-30. Claim 4 of the '093 Patent and Claim 5 of the '527 Patent use virtually identical language. '093 Patent, 13:56-59, 14:3-4, '527 Patent, 13:50-60. The specification for the Driver Patents states that "if a user wishes to communicate with a number of different resources, the user must install and update the resource driver. . . ." '527 Patent, 1:43-45. The Driver Patents discuss downloading a resource driver to the user's system if needed: "If the network terminal has not been configured with the appropriate resource driver, the administration server prompts the user's network terminal to *download* the necessary resource driver." '527 Patent, 9:21-36 (emphasis added); *see also id.* 6:28-30 ("The network terminal may also download the

22

appropriate resource driver from the driver database.").  Unlike software, hardware cannot be "downloaded."  This supports limiting "resource driver" to software.

The Driver Patents' description of the resource driver's functionality as translating, not converting, data, also supports BreezyPrint's proposed construction.  The "application communication layer passes the application data received from the application software to the resource driver for *translation* into a format suitable for processing by the selected network resource."  '527 Patent, 11:14-18 (emphasis added).

PrinterOn argues that this construction is too narrow because it would not allow the claims to cover certain embodiments described in the Canadian Priority Application.  PrinterOn also points out that the Priority Application uses the term "convert."  (Docket Entry Nos. 106, at 12; 122, at 7). But, as discussed above in construing "network terminal," none of the four asserted patents incorporates the Priority Application by reference.  Nor do the patents use the "conversion" language.  While the Canadian Priority Application is intrinsic evidence to the extent it sheds light on what PrinterOn was *not claiming* in the four patents at issue here, the Application cannot broaden the claims in the asserted patents beyond their claim language and specification.  *See Abbott Labs.*, 566 F.3d at 1289; *see also AIA Eng'g Ltd.*, 657 F.3d at 1279.

The court construes "resource driver" to mean "software for translating data to a format suitable for processing by a network resource device."

### 4.    "network resource" and "network resource device"

The parties agree that these terms, which appear in three of the four PrinterOn patents, are interchangeable.  PrinterOn proposes construing both to mean "a device that offers a service to a network terminal."  (Docket Entry No. 136, at 3).  BreezyPrint argues that the terms mean a "device

accessible by communication over a network, such as a printer, a facsimile machine, an image server, a file server, an e-mail pager, or an e-mail enabled wireless telephone." (*Id.*).  The parties' dispute is over whether these terms are limited to devices that receive communications only over a network, or also over a more direct connection, such as a USB cable attaching a network terminal to a network resource device.

Claims 1 and 5 of the '527 Patent describe a system and method "for providing a network terminal with *access* to a selected network resource device *over a network*." '527 Patent, 12:60-63, 13:36-38 (emphasis added).  Claims 1 and 4 of the '093 Patent describe a system and method "for facilitating *communication* between a network terminal and a selected network resource device *over a network*." '093 Patent, 13:1-3, 13:44-46 (emphasis added).  The '093 Patent's claim language also describes "receiving a request from the network terminal for communication access to the selected network resource device." '093 Patent, 13:41-42.  The patents summarize the invention as a "network resource access system," which "provides network terminals with access to network resources *over a network*." '527 Patent, 2:3-5 (emphasis added).  This summary is consistent with the ordinary meaning of network resource, which is distinct from a "local" resource.  *See* TECHDICTIONARY.COM (defining "local resource" as "[a] peripheral device that is directly connected to a local computer").

PrinterOn argues that this reading improperly limits the claim term to the illustrative examples in the specification.  But the specification states that "the invention is not limited to use with networked printers (IPP-compliant or otherwise), but instead can be used to provide access to any of a variety of data communication devices, including facsimile machines, image servers and file servers." '527 Patent, 3:40-46.  This description distinguishes between printers and other

networked devices, not between devices that receive communications over a network and those that receive communications over a local connection.

The court construes "network resource" and "network resource device" to mean "a device accessible by communication over a network, such as a printer, a facsimile machine, an image server, a file server, an e-mail pager, or an e-mail enabled wireless telephone."

### 5.    "configured with"

PrinterOn argues that this term should be construed as "related to via system settings or instructions," which would encompass interaction between a user device and servers. (Docket Entry No. 136, at 4). BreezyPrint argues that this term must be construed as part of the surrounding claim language in which it appears. That language states: "if the network terminal is *configured with* the resource driver associated with the driver identifier." (*Id.* (emphasis added)). In context, BreezyPrint argues, "configured with" means: "if the network terminal *includes in its Random Access Memory or instead implements in electronic hardware* the resource driver associated with the driver identifier." (*Id.* at 4 (emphasis added)). The parties' dispute is over whether "configured with" should be read to allow resource drivers to be located outside the network terminal, or instead must be read to require resource drivers to be located within the network terminal.

Claims 1 and 5 of the '527 Patent and Claims 1 and 4 of the '093 Patent use the phrase "associated with" to describe when two system parts are related to one another, similar to PrinterOn's proposed construction. *See* '527 Patent, 13:1-3 ("a resource driver associated with the selected network device"); 13:10-12 ("user configuration data associated with the network terminal"); 13:56-57 ("the selected network resource device associated with the device identifier"); '093 Patent, Claims 1 & 4 (same). The claims do not use the words "configured with" in the way

PrinterOn asserts. The claims also use "configured for" or "configured to," rather than "configured with," to describe how a given system component is set up to work compatibly with another. *See* '527 Patent, 13:22-24 ("the authorization server *configured for* determining the network terminal is authorized to access . . . the selected network resource device" (emphasis added)); '093 Patent, 13:61-63 ("the request *configured to* include a device identifier associated with the selected network resource device" (emphasis added)).

The detailed description of the preferred embodiment states that the driver and its component layers are "preferably implemented as memory objects or a memory module *in the RAM 212*" of the network terminal, but "may instead be implemented in [the network terminal's] electronic hardware, if desired." '527 Patent, 7:6-11 (emphasis added). The specification explains that "[i]f the network terminal no longer has the correct resource driver, the authorization server queries the driver database for the correct resource driver, and *prompts the user of the network terminal to download the correct resource driver*." '527 Patent, 10:63-64 (emphasis added). During the patent prosecution, PrinterOn narrowed its claims by adding limitations requiring the communication of translated data and determining whether the network terminal is configured with the appropriate resource driver. In explaining these amendments, PrinterOn stated that "the authorization server configures the *driver application on each network terminal* for communication with a selected network resource device." (Docket Entry No. 46, Ex. 8, PO-000121; *see also id.*, Ex. 9, PO-000519 ("A distinguishing feature of the invention . . . is a driver application *on each network terminal* . . . the resource driver for translating source data.").

"Configured with" should be construed as part of the broader claim language in which it appears. The phrase in which "configured with" appears states: "if the network terminal is

configured with the resource driver associated with the driver identifier." The court concludes that "configured with" means "if the network terminal includes in its Random Access Memory or instead implements in electronic hardware the resource driver associated with the driver identifier." This interpretation is consistent with how one skilled in the art would ordinarily understand "configured with" and with this court's construction of "resource driver" as software. If a computer technician asked a colleague if her personal computer was "configured with" Windows, she would understand the question to ask whether that software was present on the device.

PrinterOn's proposed construction—that the network terminal is "related to [the resource driver] via system settings"—is unnecessarily vague, lacks support in the specification, and fails to account for the patents' teachings that the resource driver is installed as software on the network terminal. PrinterOn's proposed construction also fails to account for the use of the phrase "communication of translated source data *from* the network terminal to the network resource device." '093 Patent. 13:46-47 (emphasis added).

PrinterOn argues that the court's construction contradicts the Canadian Priority Application, which describes an example of a resource driver configured on the cloud server. (Docket Entry No. 106, at 14). The fact that PrinterOn knew how to describe this embodiment and chose not to do so in applying for the four asserted patents supports BreezyPrint's proposed construction, not PrinterOn's.

PrinterOn contends that BreezyPrint's construction makes Claim 4 of the '527 Patent superfluous. Claim 4 depends on independent Claim 1, which comprises a "resource registry including resource configuration data associated with the selected network resource device," and an authorization server configured "for determining the network terminal is configured with the

resource driver associated with the driver identifier." '527 Patent, 12:65-66, 13:16-17.  Claim 4 adds limitations stating that the authorization server "is configured to establish a *secure communications channel* with the network terminal" and "*to provide a driver application* of the network terminal configured with the resource driver with the respective network terminal address *over the secure communications channel.*" '527 Patent, 13:30-35 (emphasis added).[7]  These limitations, which deal with establishing and communicating across a secure communications channel, make Claims 1 and 4 distinct.  Claim 4 is not superfluous under the court's construction.

The court construes "configured with" to mean "includes in its Random Access Memory or implements in electronic hardware."

### 6.    "translated source data"

PrinterOn argues that no construction of this term is necessary, but that if the court disagrees, it should construe "translated source data" to mean "original data converted to a different form." (Docket Entry No. 136, at 5).  BreezyPrint disagrees, arguing that the term needs construction and that it means "data, from application software, that has been translated." (*Id.*).  The parties' dispute is over whether the term should be construed to allow for "content data or control data," as PrinterOn contends, or limited to application data, as BreezyPrint argues.

The claim language supports BreezyPrint's proposed use of the word "translated," but does not resolve the parties' dispute about whether the type of data translated is "application data" or "content" or "control data." *See, e.g.*, '093 Patent, 13:4-6; '527 Patent, 12:63-64, 13:3-5, 13:50-54. The specification refers to and discusses "application data" repeatedly, including by describing

---

[7] PrinterOn also discusses a "map" in its claim-construction brief, (Docket Entry No. 106, at 10), but this argument has no support in the claim language or specification, which do not describe a "map."

28

"pass[ing] the application data received from the application software to the resource driver for translation into a format suitable for processing by the selected network resource."  '527 Patent, 11:15-18.  The terms "original data" and "conversion" do not appear.[8]  Instead, the terms "translate" and "translation" are repeatedly used in the specification to discuss a binary process under which data is either not translated and the network resource devices cannot use or print it, or translated and ready for the network-resource devices to use and print.  The intrinsic evidence is consistent with BreezyPrint's proposed construction, not PrinterOn's.

The court construes "translated source data" to mean "data, from application software, that has been translated."

### 7.     "communication of translated source data"

PrinterOn contends that this term means "transmission of translated source data within the communication network."  (Docket Entry No. 136, at 6).  BreezyPrint argues that it means "direct communication of translated source data not over a public network."  (*Id.*).  The parties' dispute is over whether the Driver Patents require the data translation to occur within the network terminal, as BreezyPrint contends, or permit data translation to occur at points along the path between the network terminal and the printing device, as PrinterOn argues.  The court concludes that this dispute is best resolved by construing "communication of translated source data" as it appears in the next disputed term, "for communication of translated source data from the network terminal to the network resource."  There is no need to construe "communication of translated source data" in isolation.

---

[8]  The Canadian Priority Application does use the term "convert" but, as discussed above, this Application does not determine the asserted patents' claim construction.

### 8. "for communication of translated source data *from* the network terminal *to* the network resource"

PrinterOn asks this court to construe "from" to mean "between"—that is, "communication of translated source data *between* the network terminal [and] the network resource." (Docket Entry No. 136, at 6). BreezyPrint argues against PrinterOn's construction as inconsistent with the ordinary meaning of "from" and impermissible in light of PrinterOn's statements about this claim during patent prosecution. (Docket Entry No. 57, at 15-16).

PrinterOn's construction would allow "a communication of an item from A to C" to include having an unfinished version of an item start at A, be finished at B, and be communicated from B to C in finished form. BreezyPrint's construction would require that "a communication of an item from A to C" begin at A with the finished item. PrinterOn's construction does not require that fully translated data begin at a network terminal, so long as the data is translated as it is communicated between the network terminal and the network resource, or printing device. BreezyPrint's construction requires that the data be translated on the network terminal before the data is communicated from the network terminal to the network resource.

The court rejects PrinterOn's proposal to construe "from" to mean "between" so as to permit the data translation to occur after the network terminal has begun to communicate the data to the network resource. Instead, "from" and "to" should be construed as describing the beginning and end points, not all the points in between. Translated data communicated "from" the network terminal must start at the network terminal. PrinterOn's proposed construction is inconsistent with the ordinary meaning of "from" and "to," meaning starting at a beginning point and ending at another point.

PrinterOn's proposed construction is also inconsistent with the claim language. Claims 1 and 4 of the '093 Patent use the word "from" in a way that is consistent with the beginning points. These claims use the word "between" in a context that is consistent "any point along the way" that separates A and B. *Compare* '093 Patent, 13:1-5 ("facilitating communication *between* a network terminal and a selected resource device") *with id.* ("communication of translated source data *from* the network terminal"). The claim language also describes "translated" data, not data for later translation. *See* '527 Patent, 12:63, 13:2-3, 13: 53-54; '093 Patent, 13:3-5, 13:15-16.

The court construes "from" and "to" as requiring that the communication of translated source data start at the network terminal.

> 9. **"for facilitating communication between a network terminal and a selected network resource device over a network for communication of translated source data from the network terminal to the network resource device"**

PrinterOn argues this claim language should be construed in accordance with court's construction of the constituent terms. BreezyPrint argues that only the "communication of translated source data" portion of this term should be separately construed. There is no need to construe this phrase separately from the constituent terms already construed.

> B. **The Disputed Claim Terms in the Password Patents (the '188 and '293 Patents)**

The '188 Patent has three independent claims. Two are system claims and one is a method claim. The '293 Patent has two independent claims, one system and one method. All five independent claims in the Password Patents require receiving an "authorization password" "in response to" a "poll request." Each Password Patent includes an additional, but distinct, limitation. The three independent claims of the '188 Patent require "communicating the authorization password

to a destination address," and the two independent claims of the '293 Patent require "decompress[ion] to extract [the] authorization password."  *See* '188 Patent, 13:7, 35; 14:37; '293 Patent, 12:43; 14:1.

### 1.    "authorization password"

PrinterOn contends that this term means "an identifier that allows, provides, facilitates, or controls access to a network resource or network printing device." (Docket Entry No. 48, at 9-10). BreezyPrint asks the court to construe this term to mean "an identifier that determines whether a request to access a resource will be allowed."  (Docket Entry No. 37, at 20).

The Password Patents describe transmitting application data "if the received authorization password is valid."  '293 Patent, 11:47-49.  The patents claim an "authorization password for the network resource."  '293 Patent, 12:52-53, 14:9-10; *see also* '188 Patent, 13:21-22, 13:50-51; 14:51-52.  The authorization password is what provides or controls "access to the network resource located behind the firewall."  '293 Patent, 12:54-55, 14:9-10; '188 Patent, 13:30-31, 13:54-55; 14:54-55.  As the detailed description of the preferred embodiment states, the identified network terminals "must provide [the authorization password] in order to access the network resource."  '293 Patent, 4:66-5:2 (emphasis added).  This involves more than using the password for "facilitating" access.  The authorization password itself must be verified before a request to access the network resource is granted.  The patent claims describe the password as "facilitat[ing] access to the network resource," but the network resource itself must be "configured for *authorized access*."  '293 Patent, 13:58-60 & 16:7-9 (emphasis added); *see also* '188 Patent, 13:30-31 ("the authorization password configured for controlling access to the print data"), 13:9-11 ("the data package configured for authorized data processing by the network printing device"), 13:36-37 (same).  This claim language

shows that an "authorization password" is an identifier that does more than facilitate access, as PrinterOn proposes. Without a valid authorization password, there is no access.

BreezyPrint's narrower construction is also consistent with the ordinary meaning of an authorization password as requiring verification before access is allowed. *See Phillips*, 415 F.3d at 1314 ("In some cases the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent, even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words."). To use an analogy, an authorization password is more like a passport than a plane ticket. A traveler flying home from abroad has both. The ticket "facilitates" the traveler's access to the home country by allowing the traveler to arrive there. But the traveler may not enter—access—the home country without a passport recognized as identifying the traveler and authorizing entry. Without an authorization password, data could not successfully be released from the printer in PrinterOn's system. It is the password that controls access.

The prosecution history supports this construction. After the PTO rejected PrinterOn's first applications for the two Password Patents, which did not require either polling or an authorization password, PrinterOn added the following requirements: receiving an authorization password in response to a poll request (both Password Patents); communicating that password to a destination address (the '188 Patent); and decompression to extract the authorization password (the '293 Patent). (Docket Entry No. 40-3, at 58-81; 40-7, at 11-19; 40-4, at 34-35).

PrinterOn's construction of an authorization password as an identifier that "facilitates" access is also inconsistent with the presumption that different claim terms have different meanings. PrinterOn's proposed construction for a "destination address" is an "identifier of a print server or

33

a printing device."   Under PrinterOn's construction, a "destination address" would also be an "authorization password" because it is an "identifier that facilitates access."   All authorization passwords facilitate access.   But as the destination address example illustrates, not all identifiers that facilitate access are authorization passwords.

BreezyPrint's narrower construction is a more accurate description of what an authorization password does.   But it is narrower than the claim language and unnecessarily excludes certain terms.   *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004) (observing that "a claim construction analysis must begin and remain centered on the claim language itself").   For example, the claims state that the authorization password is "for *allowing* access of the print data by the network printing device," *see* '293 Patent, 14:54-56 (emphasis added), "configured for *controlling* access to the print data by  the printing device," *id.* at 13:30-31 (emphasis added), and for "*providing access* to the network resource located behind the firewall," *id.* at 14:10-11 (emphasis added).

The court concludes that "authorization password" means "an identifier that allows or controls access to a network resource or network printing device."

### 2.        "application data"

This term appears in the '293 Patent but not in the '188 Patent.   PrinterOn argues that no construction is needed.   If the court disagrees, PrinterOn argues that the term means "data from an application." (Docket Entry No. 136, at 10).   BreezyPrint contends that it should be construed  and that it means "data including both an authorization password and data for processing by a network resource."   (*Id.*).

Claim 1 and Claim 21 of the '293 Patent require "a polling server located logically behind a firewall, the polling server configured to *poll the proxy server to . . . receive the application data* and the associated network resource data across the firewall" from the proxy server before passing through "an enterprise server configured to *decrypt and decompress the application data to extract the authorization password*" before "transmit[ting] the application data to the network resource." '293 Patent, 12:63-67, 13:3-5; 14:18-26 (emphasis added).  By requiring that the authorization password be "extract[ed]" from the application data, Claims 1 and 21 treat the term "application data" as including both an "authorization password" and the data for processing by the network resource before successful printing.  The specification states that "the data transmitter layer" "receives the authorization password for the network resource from the driver administrator layer" and "transmits the authorization password (*as part of the compressed, encrypted data*) to the network resource." '293 Patent, 11:26-31 (emphasis added).

PrinterOn argues that the authorization password is separate from, and not included in, the application data.  PrinterOn points to the fact that the application data is sent to the network resource device for final processing after the authorization password is extracted.  This merely recognizes that the application data also includes data for further processing after the enterprise server has extracted and validated the authorization password.  It is consistent with recognizing that the authorization password is part of the application data before it is extracted from that data.

The court concludes that "application data" means "data including both an authorization password and data for processing by a network resource."

### 3.    "destination address"

This term is found only in the '188 Patent.  PrinterOn argues that it should be construed to mean "an identifier of a print server or a printing device."  (Docket Entry No. 47, at 11-12).  BreezyPrint argues that this term should be construed to mean "an identifier that determines the target of a network communication."  (Docket Entry No. 37, at 20-21).

Claim 1 describes "communicating at least the print data and the authorization password to the destination address."  '188 Patent, 13:28-31.  Claim 2 describes a "destination address for directing the data package over the network."  '188 Patent, 13:52-53.  Claim 4, a dependent claim, describes a system in which the "destination address identifies the network address for the network printing device."  '188 Patent, 14:1-3.  Claim 5 further describes a "print server coupled to the network printing device, such that the destination address identifies the address of the print server."  '188 Patent, 14:5-8.  The term "destination" does not appear in the Password Patents' specification.  The specification instead describes the "destination address" as the "target."  '188 Patent, 1:60-65 ("there remains a need for a network resource control system . . . which facilitates simultaneous communication with a number of *target resources*" (emphasis added)); *id.* at 9:2-5 ("The network user query may be based upon any desired criteria, including print turn-around time and page size (where the *target network resource* is a printer)" (emphasis added)).   Under PrinterOn's construction, a printer's serial number, which identifies a printer but is not the target of a network communication, would qualify as a "destination address."

The court concludes that "destination address" means "an identifier that determines the target of a network communication."

### 4.    "decompress" and "decompressing"

PrinterOn contends that these terms need not be construed, but if the court does, PrinterOn argues that they mean "restore compressed data to its original form/restoring compressed data to its original form." (Docket Entry No. 136, at 10). BreezyPrint disagrees, arguing that the terms mean "return[ing] to a larger size." (*Id.*).

The claim language uses "decrypt and decompress" and "decrypting and decompressing." '293 Patent, 13:3, 14:26. The specification describes "compress[ing] and encrpyt[ing] the translated application data upon receipt" before communicating it over across the firewall towards the network resource device. '293 Patent, 11:8-10; *see id.*, 11:12-13 ("adds the network address data to the compressed, encrypted data, and then transmits the resulting data over the communications network"); 11:30-31 ("as part of the compressed, encrypted data"). The ordinary meaning of "compress" is to decrease in size; "decompress" means to increase in size. Once the compressed data passes through the firewall, a server "decrypt[s] and decompress[es] the application data" before transmitting it to the network resource device for printing. '293 Patent, 11:8-10, 11:32-35, 11:60-64. As PrinterOn itself observes, "[a] person of ordinary skill in the art understands that 'compression' is an alternate encoding of information that takes up less 'space'—where 'space is roughly the number of bits used to store the information." (Docket Entry No. 122 at 20). Although PrinterOn argues that this "changes the form of the file" in addition to "reduc[ing]" its size, the purpose of "compressing" is to reduce the space needed for the data. PrinterOn's proposed construction includes the broader term "form," rather than focusing on "size." PrinterOn's proposed construction fails to account for the possibility that compressed data may be restored to its original size without otherwise altering its form.

The court agrees with BreezyPrint and construes "decompress" and "decompressing" to mean "return" or "returning" to "a larger size."

      5.      **"polling server"**

PrinterOn argues that no construction is necessary, but that if the court does construe this term, it should be construed as "a server that initiates a polling communication." (Docket Entry No. 136, at 9). BreezyPrint contends that "polling server" should be construed to mean "software that periodically polls another server to determine whether that other server has any data for it." (*Id.*).

The court agrees that construction is appropriate for this term. The second half of BreezyPrint's proposed construction, that the polling server issues a polling request to "determine whether that other server has any data for it" is consistent with the claim language and the specification. *See* '293 Patent, Claim 1, 12:64-65 ("configured to poll the proxy server to determine a status of the queue and to receive the application data"); Claim 21, 14:20-23 ("polling the proxy server . . . to determine a status of the queue and to receive . . . application data from the queue"); Spec., 11:55-5 ("will poll the proxy server . . . to determine the status of the queue"). As for the "periodic" requirement, the claims do not themselves require that the server operate on a fixed schedule. But the polling server would be unable to function as the patents contemplate unless it initiated polling communications with some regularity to determine whether the proxy server had any print data for the polling server. The specification describes an example of a polling server that is "configured to periodically poll," '293 Patent at 4:7-12.

The court concludes that "polling server" means "a server that periodically polls another server to determine whether that other server has any data for it."

    C.      **Chart of the Court's Construction of the Disputed Terms**

| DISPUTED TERM | COURT'S CONSTRUCTION |
|---|---|
| "network terminal"<br><br>('527 Patent, Claims 1-9, 13, 17; '093 Patent, Claims 1-2, 4-5, 9, 11, 13, 16, 18, 20; '188 Patent, Claims 1-3, 12, 14, 18; '293 Patent, Claims 1, 8, 16, 19, 21, 28, 29, 33, 41, 44) | "a device that originates the communication for the network resource" |
| "server"<br><br>('527 Patent, Claims 1-2, 4, 9-10, 12-13, 15, 20; '093 Patent, Claims 1-3, 7, 13-14; '293 Patent, Claims 1-2, 5-7, 11, 14, 20-21, 30-32, 36, 45; '188 Patent, Claims 1-2, 5-6, 11-12, 14) | "software that receives a request from other software and provides a resource in response" |
| "resource driver"<br><br>('527 Patent, Claims 1-2, 4-5, 13-14, 16-17; '093 Patent, Claims 1-2, 4-5) | "software for translating data to a format suitable for processing by a network resource device" |
| "network resource" and "network resource device"<br><br>('527 Patent, Claims 1-2, 5-6, 8-10, 12-18, 20; '093 Patent, Claims 1-7, 9-14, 16-20; '293 Patent, Claims 1-2, 6-7, 10, 14-15, 17-22, 26-29, 31-32, 35, 39-40, 42-45) | "a device accessible by communication over a network, such as a printer, a facsimile machine, an image server, a file server, an e-mail pager, or an e-mail enabled wireless telephone" |
| "configured with"<br><br>('527 Patent, Claims 1, 4, 13, 17; '093 Patent, Claims 1, 4) | "includes in its Random Access Memory or implements in electronic hardware" |
| "translated source data"<br><br>('527 Patent, Claims 1, 5, 11, 19-20; '093 Patent, Claims 1, 4, 8, 13, 20) | "data, from application software, that has been translated" |

| | |
|---|---|
| "for communication of translated source data from the network terminal to the network resource"<br><br>('527 Patent, Claims 1, 5; '093 Patent, Claims 1, 4) | The court construes "from" and "to" as requiring that the communication of translated source data start at the network terminal |
| "authorization password"<br><br>('188 Patent, Claims 1-2, 9, 12, 14-15, 17-18; '293 Patent, Claims 1, 18-19, 21, 43-44) | "an identifier that allows or controls access to a network resource or network printing device" |
| "application data"<br><br>('293 Patent, Claims 1-2, 4, 9, 19-23, 34, 44-45) | "data including both an authorization password and data for processing by a network resource" |
| "destination address"<br><br>('188 Patent, Claims 1-2, 4, 5, 14) | "an identifier that determines the target of a network communication" |
| "decompress" and "decompressing"<br><br>('293 Patent, Claims 1, 21) | "return" or "returning" to "a larger size" |
| "polling server"<br><br>('188 Patent, Claims 1-2, 12; '293 Patent, Claims 1-2, 20-21, 45) | "a server that periodically polls another server to determine whether that other server has any data for it" |
| "polling sewer"<br><br>('188 Patent, Claim 14) | "polling server" |
| "as"<br><br>('188 Patent, Claim 12) | "is" |

## IV.     The Pending Motions

### A.     BreezyPrint's Motions for Summary Judgment that it Does Not Infringe (Docket Entry Nos. 32, 37)

#### 1.     The Driver Patents (Docket Entry No. 32)

BreezyPrint argues that if its proposed claim constructions are adopted, its product does not literally infringe PrinterOn's Driver Patents as a matter of law.   BreezyPrint also argues that PrinterOn's disavowals during claim prosecution estop it from arguing infringement under the doctrine of equivalents and would otherwise vitiate the patents' literal "metes and bounds."   Both literal infringement and infringement under the doctrine of equivalents are analyzed below.

#### a.     Literal Infringement

Literal infringement of a claim requires every limitation recited in the claim to appear in the accused device.   The "properly construed claim [must] read[] on the accused device exactly." *Cortland Line Co., Inc. v. Orvis Co., Inc.*, 203 F.3d 1351, 1358 (Fed. Cir. 2000).   If even one limitation is missing or not met as claimed, there is no literal infringement.   *Moba, B.V. v. Diamond Automation, Inc.*, 325 F.3d 1306, 1313 (Fed. Cir. 2003); *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 812 (Fed. Cir. 2002).   Summary judgment on literal infringement is proper "when no genuine issue of material fact exists, in particular, when no reasonable jury could find that every limitation recited in the properly construed claim either is or is not found in the accused device." *Goldenberg v. Cytogen, Inc.*, 373 F.3d 1158, 1164 (Fed. Cir. 2004) (quoting *Bai*, 160 F.3d at 1353).

BreezyPrint contends that it is entitled to summary judgment if the court adopts its proffered constructions because it is undisputed that its user devices never "communicate *translated* data to a network resource" and are not "configured with a resource driver."  If the Driver Patents require the use of a "driver" to translate data on the user's device before sending it to the printer, BreezyPrint's system does not infringe because it moves the "driver" translation function away from the user devices or originating server and onto BreezyPrint's own intermediary servers.  Because BreezyPrint's data translation occurs outside the "network terminal"—that is, outside the user's device or the originating server—its system does not literally infringe PrinterOn's patents.

Given the court's claim construction, there is no genuine factual dispute material to determining that BreezyPrint does not literally infringe PrinterOn's Driver Patents.  Under the court's construction of the disputed claim terms, the Driver Patents claim a system and method for translating data on a user device (such as a smart phone or a tablet) or on an originating server, communicating the translated data to an intermediary "proxy server" on the user side of the firewall, and sending the translated data from the intermediary server across the firewall for eventual printing at the network resource device, or printer.  Intermediary servers do not translate the data in PrinterOn's patented system.

In BreezyPrint's system, by contrast, the Breezy Rendering Engine and the Breezy Connector translate the data in question.  These are intermediary servers.  They do not originate the communication across the network.  (Docket Entry No. 34, ¶¶ 19-20).  Instead, they receive the untranslated data communicated from the user device through the Breezy Mobile App.

PrinterOn argued at the *Markman* hearing that there is a genuine fact dispute material to determining whether BreezyPrint's product translates "control data" on user devices before sending

otherwise untranslated data to the Breezy Cloud.  *See* Markman Trans. at 175 ( Nov. 5, 2014).

BreezyPrint contends that PrinterOn did not make this argument in its briefs.  *See id.*  PrinterOn's

expert, Tipton Cole, did discuss "control data" when criticizing BreezyPrint's proposed construction

of "resource driver" on the ground that it excluded "the translation of control data which is used to

control the print process."  (Docket Entry No. 70-2, ¶ 54).  And PrinterOn argued in its response to

BreezyPrint's motion for summary judgment that "data from the user application [on a mobile

device] is converted in some way before it can be used by the BreezyPrint [Mobile] Application."

(Docket Entry No. 46, at 23).  But neither PrinterOn nor its expert have identified a basis in

BreezyPrint's source code or other record evidence to support PrinterOn's contention that the

BreezyPrint system translates "control data" on the user device or that "control data" is a type of

"source data."  PrinterOn points to a BreezyPrint "Secure Cloud Printing Architecture" brochure,

(*id.*, Ex. 7), but that document does not discuss data translation or otherwise support PrinterOn's

argument.  There is no genuine factual dispute that the BreezyPrint system does not require user

devices that communicate translated data to a network resource and that are configured with a

resource driver.

PrinterOn also argues that BreezyPrint literally infringes because it uses a "mapping"

function in the Breezy Cloud to ensure that user devices are "configured with" the appropriate

resource translation driver.  But this argument rests on PrinterOn's construction of "configured

with," which the court has rejected.  The intrinsic evidence shows that "configured with" does not

simply mean "related to via system settings."  Instead, the court construed "configured with" to

mean "includes in its Random Access Memory or instead implements in electronic hardware."

43

Because BreezyPrint's system does not communicate data that has been translated on a user device or a server that originates the communication, BreezyPrint does not literally infringe the Driver Patents.

**b.     Infringement Under the Doctrine of Equivalents**

PrinterOn argues that BreezyPrint infringes under the doctrine of equivalents.  BreezyPrint disputes the contention and PrinterOn's ability to raise it.

"The doctrine of equivalents allows the patentee to claim those insubstantial alterations that were not captured in drafting the original patent claim but which could be created through trivial changes." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 733 (2002). Infringement under the doctrine of equivalents requires that the accused product contain each limitation of the claim or its equivalent.  The doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole.  *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997).  "An element in the accused product is equivalent to a claim limitation if the differences between the two are 'insubstantial' to one of ordinary skill in the art." *Eagle Comtronics, Inc. v. Arrow Commc'n Labs., Inc.*, 305 F.3d 1303, 1315 (Fed. Cir. 2002).  The test for equivalence is whether the accused structure performs substantially the same function, in substantially the same way, to achieve substantially the same result as the claimed invention. *Warner-Jenkinson*, 520 U.S. at 40.  Summary judgment that an accused device does not infringe under the doctrine of equivalents is appropriate if "no reasonable jury could determine two elements to be equivalent." *Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.*, 285 F.3d 1353, 1360 (Fed. Cir. 2002) (quoting *Warner-Jenkinson*, 520 U.S. at 39 n. 8).

Although infringement under the doctrine of equivalents is a fact question, a court may determine as a matter of law that the "all limitations" rule, the prior art, or prosecution history estoppel preclude the claim. *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337 (Fed. Cir. 2001); *see also Festo*, 535 U.S. at 736; *Glaxo Wellcome, Inc. v. Impax Labs., Inc.*, 356 F.3d 1348, 1351 (Fed. Cir. 2004). Under the "all limitations rule," the doctrine of equivalents does not apply if it would vitiate an entire claim limitation. *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1321 (Fed. Cir. 2003). The doctrine of equivalents does not apply "if the asserted scope of equivalency of what is literally claimed would encompass the prior art." *Wilson Sporting Goods Co. v. David Geoffrey and Assocs.*, 904 F.2d 677, 683 (Fed. Cir.1990) ("A patentee should not be able to obtain, under the doctrine of equivalents, coverage which he could not lawfully have obtained from the PTO by literal claims."). And prosecution-history estoppel may bar a patentee from asserting infringement under the doctrine of equivalents if the claim scope has been narrowed by amendment or argument during the patent prosecution. *Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314 (Fed. Cir. 2003).

BreezyPrint claims that PrinterOn is estopped from asserting infringement under the doctrine of equivalents because it amended and narrowed its claims to obtain its patents. "Where an amendment narrows the scope of the claims, and that amendment is adopted for a substantial reason related to patentability, the amendment gives rise to a presumption of surrender for all equivalents that reside in 'the territory between the original claim and the amended claim.'" *Intervet Inc. v. Merial Ltd.*, 617 F.3d 1282, 1291 (Fed. Cir. 2010) (quoting *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 740 (2002)). "This presumption can be overcome by showing that 'at the time of the amendment one skilled in the art could not reasonably be expected to have drafted

a claim that would have literally encompassed the alleged equivalent.'" *Intervet*, 617 F.3d at 1291 (quoting *Festo*, 535 U.S. at 741). "One way to make this showing is to demonstrate that 'the rationale underlying the narrowing amendment bore no more than a tangential relation to the equivalent in question.'" *Intervet*, 617 F.3d at 1291 (quoting *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1368 (Fed. Cir. 2003) (en banc)). "Although there is no hard-and-fast test for what is and what is not a tangential relation, it is clear that an amendment made to avoid prior art that contains the equivalent in question is not tangential." *Id.* (citing *Pioneer Magnetics, Inc. v. Micro Linear Corp.*, 330 F.3d 1352, 1357 (Fed. Cir. 2003)).

"The applicability of prosecution history estoppel does not completely bar the benefit of the doctrine of equivalents from all litigation related to the amended claim." *Id.* "The scope of the estoppel must fit the nature of the narrowing amendment. A district court must look to the specifics of the amendment and the rejection that provoked the amendment to determine whether estoppel precludes the particular doctrine of equivalents argument being made." *Id.* If one of ordinary skill in the art would consider the accused product to be surrendered subject matter, the doctrine of equivalents cannot be used to claim infringement by that product. *Schwing GmbH v. Putzmeister Aktiengesellschaft*, 305 F.3d 1318, 1324–25 (Fed. Cir. 2002).

During the prosecution of the Driver Patents, PrinterOn disclaimed various limitations after the PTO rejected the application based on prior art. PrinterOn added two claim limitations to the Driver Patents' independent system and method claims: (1) "for communication of translated source data from the network terminal to the network resource device" and (2) "determining if the network terminal is configured with the resource driver." (Docket Entry No. 35, Exs. 3, 4; PO-00511-13; PO-000113-15; PO-000121, PO-000519). PrinterOn argues that the amendment did not surrender

any equivalents that are the basis of its infringement claim against BreezyPrint because the prior art is not analogous.  But "the doctrine is broader than that.  The [Supreme] Court has held that '[e]stoppel arises when an amendment is made to secure the patent and the amendment narrows the patent's scope,' expressly stating that 'a narrowing amendment made to satisfy *any* requirement of the Patent Act may give rise to an estoppel.'"  *Pacific Coast Marine Windshields Ltd. v. Malibu Boats, LLC*, 739 F.3d 694 (Fed. Cir. 2014) (quoting *Festo*, 535 U.S. at 736).

The PTO rejected PrinterOn's initial claims.  Only after PrinterOn added the limitations did the PTO issue the Driver Patents.  These amendments narrowed the patents' scope for reasons of patentability.  The *Festo* presumption "of surrender for all equivalents that reside in 'the territory between the original claim and the amended claim'" applies.  *See Intervet Inc. v. Merial Ltd.*, 617 F.3d 1282, 1291 (Fed. Cir. 2010) (quoting *Festo*, 535 U.S. at 740).

PrinterOn argues that it overcomes the *Festo* presumption because it surrendered only the "territory" having to do with client-side digital certificates, not with controlling access to a resource over a network.  PrinterOn argues that it is asserting the doctrine of equivalents to claim that the BreezyPrint system for controlling access over the network infringes.  PrinterOn relies on two cases: *Intervet*, 617 F.3d 1282, in which the court concluded that the district court "erred in finding that prosecution history estoppel precluded [the patentee] from arguing that the accused product is equivalent to one of the exemplary embodiments of the asserted claim," *id.* at 1292; and *Pacific Coast*, 739 F.3d 694, in which the court reversed the district court's application of prosecution history estoppel because the accused design was not "within the scope of the surrender."  *Id.* at 704.

Neither case supports PrinterOn's argument that it has not surrendered territory that it asserts as the basis of its infringement claim.  In *Intervet*, the patentee's claims sought to cover isolated

DNA molecules comprising a sequence selected from a particular type of nucleotide bases forming a codon referred to an "open reading frame" (ORF). The PTO rejected the claim in light of prior art disclosing non-porcine ORFs. The patentee amended the claim to limit it to ORFs of "porcine" origin. The Federal Circuit held that this narrowing amendment triggered the *Festo* presumption and estopped the patentee "from arguing that ORFs of pathogenic circoviruses found in other organisms are equivalent to [the literally claimed porcine ORFs]." *Intervet*, 617 F.3d at 1292. The court did not, however, inquire into precisely what type of non-porcine prior art had forced the amendment. The prior art related to only bovine ORFs. The court nevertheless held that the patentee was estopped from asserting infringement under the doctrine of equivalents for all non-porcine applications. The patentee was "also estopped from arguing that ORFs of a pathogenic strain of PCV–1 are equivalent to ORFs of PCV–2, despite the strain having strong homology with PK/15 and weak homology with the representative strains disclosed in the patent." *Id.* at 1292.

The court did allow the patentee to argue that a "pathogenic porcine viral sequence with over 99% nucleotide homology with one of the five [disclosed] representative strains," such as the defendant's "vaccine contain[ing] a nucleotide sequence that was 99.7% homologous," was "equivalent to that [patented] strain." *Id.* at 1292. But the patent described the five strains as "*representative* of a new type of porcine circovirus" and described only 96% homology between the sequences disclosed in the specification. *See* U.S. Patent No. 6,383,601, 1:48–62 ("The applicant has succeeded in isolating five new PCV strains. . . . The applicant has, in addition, sequenced the genome of four of these strains. . . . The new strains can thus be considered as being representative of a new type of porcine circovirus, called here type II."); *see also Intervet*, 617 F.3d at 1285 ("The patent description observes that the sequenced strains exhibit 96% nucleotide homology with each

other.").  The *Intervet* patentee surrendered its ability to argue equivalents that were non-porcine

ORFs.  PrinterOn has similarly surrendered its ability to argue equivalents that do not include the

"communication of translated source data" or "determining" if "the network terminal is configured

with the resource driver" limitations.

The *Pacific Coast* case PrinterOn cites also fails to support its position.  In *Pacific Coast*,

the patentee submitted several drawings to the PTO for a patent covering a boat windshield design.

The drawings included windshields with zero, two, and four securing holes on the corner post, but

not a windshield with three holes.  The PTO required the applicant to restrict his patent to one of the

figures under 35 U.S.C. § 121.  The patentee choose the four-hole embodiment and "later obtained

a patent for the design with no holes . . . but did not file another divisional application with respect

to any of the other embodiments."  *Pacific Coast*, 739 F.3d at 698.  The defendant, Malibu Boats,

produced a three-hole windshield.  The patentee sued, alleging infringement under the doctrine of

equivalents.  The district court concluded that prosecution-history estoppel applied to bar the

patentee from alleging infringement under the doctrine of equivalents.  The Federal Circuit reversed,

concluding that "[t]he applicant surrendered the claimed design with two holes on the windshield

corner post" that it had submitted and declined to patent when forced to chose one design, but

"neither submitted nor surrendered any three-hole design."  *Pacific Coast*, 739 F.3d at 704-05.  "The

record [thus] only reflect[ed] the surrender of the two-hole embodiment."  *Id.* at 705.

The patents at issue here are not design patents as in *Pacific Coast*, but system and method

patents.  As a result, the "territory between the original claim and the amended claim" submitted to

avoid the prior art has more relevance.  The patentee in *Pacific Coast* did not surrender the territory

to avoid prior art.  Instead, the surrender was "because of a restriction requirement under 35 U.S.C.

§ 121." *Id.* at 703.  The patentee could choose between its original claim or the amended claim and still achieve patentability.  PrinterOn could not have chosen its original claim because the prior art required amendment.  Even if PrinterOn could have chosen a less restrictive amendment to avoid prior art, PrinterOn did not.  In *Pacific Coast*, the Federal Circuit did not find meaningful the distinction between amendments required to avoid prior art and amendments permitted to overcome other issues in a design patent application.  But the Federal Circuit's focus was on whether prosecution history estoppel could apply to design patents and whether there "was a surrender of claim scope" in the context of a design patent.  *Id.* at 702.  The Federal Circuit did not consider in *Pacific Coast* how design patents as opposed to system and method patents affect the way courts analyze the scope of surrender resulting from claim amendments.  *See Pacific Coast*, 739 F.3d at 704 (observing that the "range concept does not work in the context of design patents where ranges are not claimed, but rather individual designs" because "[c]laiming different designs does not necessarily suggest that the territory between those designs is also claimed").

In addition, PrinterOn's argument is analogous to the "surrendered . . . claimed design with two holes on the windshield corner post" that the *Pacific Coast* patentee first submitted to the PTO and then chose not to patent.  *See id.* at 705.  Like the design patentee that abandoned the two-hole design when forced to choose an embodiment, PrinterOn may not argue that BreezyPrint infringes by equivalents an unpatented system that it narrowed considerably in response to the PTO's prior art rejection.

Because PrinterOn has not overcome the *Festo* presumption, it is estopped from invoking the doctrine of equivalents to assert that BreezyPrint infringes the Driver Patents.  BreezyPrint's

50

motion for summary judgment that it does not infringe the Driver Patents, (Docket Entry No. 32), is granted.

### 2.    The Password Patents (Docket Entry No. 37)

BreezyPrint also moved for summary judgment that it does not infringe the '188 and '293 Patents, the Password Patents.  (Docket Entry No. 37).  BreezyPrint argues that under its proffered claim construction and in light of the patents' prosecution history, it neither literally nor equivalently infringes.

The Password Patents describe a system in which a firewall separates the network terminal—a user device like an iPhone or originating server—from the network resource device—such as a printer—to prevent security breaches.  Servers are on both the inside and the outside of the firewall.  The server on the user side of the firewall is a "proxy server."  The two servers on the printer side of the firewall are a "polling server" and an "print server."  When a network terminal sends data for a print job to the network resource device, each job queues in a compressed format on the proxy server located outside the firewall on the user side.  The polling server periodically "polls"—communicates with—the proxy server to see if it has any print jobs waiting that need to move through the firewall to the printer.  In response to that poll request, the proxy server sends the compressed print job across the firewall to the print server, which decompresses the data, extracts the authorization password, and confirms the authorization password's validity.  Once the authorization password is validated, the print job proceeds to the printing device for release to the user.

BreezyPrint's system places its "Breezy Mobile App" and the "Breezy Cloud" on the user side of the firewall and the "Breezy Connector" on the printer side.  The Breezy Mobile App is an

iPhone (or similar device) app available to the user. The user interacts with the Breezy Mobile App to send a print job into the Breezy Cloud, a server that is also on the user side of the firewall, similar to the "proxy server." The Breezy Connector, on the printer side of the firewall, communicates with the Breezy Cloud to find waiting print jobs, like the "polling server" described above. PrinterOn argues that these similarities show that the accused BreezyPrint product infringes both literally and under the doctrine of equivalents.

### a. Literal Infringement

BreezyPrint argues that the court's claim constructions require a finding of no infringement. The Password Patent claims require the receipt of an authorization password in response to a poll request (in the '188 and '293 Patents), the communication of the password to a destination address (in the '188 Patent), and the decompression of the print-job data to extract the password (in the '293 Patent). BreezyPrint argues that the undisputed facts show that its products do not receive an "authorization password" in "response to a poll request," do not communicate a password to any "destination address," and do not "decompress" data or files to extract an authorization password.

### i. The Claims that Apply to Both the '188 and '293 Password Patents

The court construed "authorization password" to mean an "identifier that allows or controls access to a network resource device." Under this construction, the password is not provided and verified until after the data is communicated in response to a poll request and passes through the firewall before it is printed. The uncontroverted record evidence shows that BreezyPrint's products do not receive an authorization password after a print job crosses the firewall. BreezyPrint's founder and CEO, Jared Hansen, submitted a declaration stating that "[n]othing in any BreezyPrint product

ever receives, in response to a poll request, any identifier that determines whether a request to access a resource will be allowed." (Docket Entry No. 39, ¶ 26). Hansen's declaration gives an example of how the BreezyPrint system operates. When a BreezyPrint user wants to print on one of her pre-approved printers, she may use a mobile app on a smart phone to select the file to be printed. Unlike in the PrinterOn system, the BreezyPrint Mobile App will reveal only those printers for which the user has been preauthorized. The user's mobile app sends this file to the Breezy Cloud for data translation along with a "printer_id"[9] code identifying the preapproved destination printer. The Breezy Connector polls the Breezy Cloud to determine if a translated print job is waiting. Once the Breezy Connector determines that a print job is ready and waiting, the Breezy Connector downloads the job from the Breezy Cloud and submits it to preauthorized printer without a password. (Docket Entry No. 39, ¶ 14). There is no password or identifier verification because the Breezy Cloud has already provided the user's mobile app with identifiers of the specific printers the user is preauthorized to use. (*Id.*, ¶ 27). The user can send a print job only to a printer BreezyPrint has already authorized her to use. (*Id.*). The Breezy Connector cannot receive a print job that is unauthorized and no authorization password is sent to or extracted by the Breezy Connector.[10]

_____

[9] BreezyPrint argues that "PrinterOn does not point to a single line of source code, a single function of source code that receives or sends the printer ID." Markman Trans., at 205 (Nov. 4, 2014). BreezyPrint nonetheless "recognize[s] there's something that gets the [print job] where it's going. It's just—it's not the printer ID." *Id.* The parties therefore agree that BreezyPrint's system uses something similar to the "printer_id" to move the print job to the preauthorized printer. For the sake of simplicity, the court refers to this component as the "printer_id."

[10] The BreezyPrint system regulates the print-release process in two additional ways. First, when a BreezyPrint user wants to send a print job to a printer at a third-party printing service, like FedEx office, the mobile app sends the file to the Breezy Cloud, which sends the untranslated file directly to FedEx, without any polling from the Breezy Connector. FedEx then provides the Breezy Cloud with the release code, which is available to users on their mobile app screen. When a user enters that code, the print job releases. (Docket Entry No. 39, ¶ 15). Second, the BreezyPrint system includes a facsimile scenario. A user device transmits

PrinterOn argues that BreezyPrint's use of the printer_id code to identify the preauthorized printer before printing is the use of an authorization password.   The record does not support this argument.   Hansen's declaration states that "[n]othing in any BreezyPrint product ever receives, in response to a poll request, any identifier that determines whether a request to access a resource will be allowed."   (Docket Entry No. 39, ¶ 26).   He states that "[t]he Breezy Connector never receives, in response to a poll request, any release code, end_point, printer_id, or connector_id in any form, compressed or otherwise."   (*Id.*).   PrinterOn points to the declaration of its own expert, Tipton Cole, who states that "[t]he Breezy Cloud . . . transmits the print job, including the 'printer_id,' to the Breezy Connector in response to the poll" request sent by "[t]he Breezy Connector."   (Docket Entry No. 48-6, ¶ 26(d)).   But Cole's declaration is limited to PrinterOn's broader proposed construction of authorization password, which the court rejected.   Cole does not identify how BreezyPrint accomplishes the alleged infringement or the source code that could do so under the court's narrower construction of authorization password, which requires verification.   The printer_id code allows a user to communicate translated data to the user's printer, but the code does not need to be verified to allow the printing to proceed.

PrinterOn argues that the printer_id "necessarily determines whether a request for access a resource will be allowed" because "[w]ithout the correct 'printer_id,' the Breezy Connector cannot send the print job to the intended printer."   (Docket Entry No. 48, at 19).   But this argument misunderstands both the court's construction of the term, authorization password, and BreezyPrint's

---

an untranslated file to the Breezy Cloud, which sends the file to a third-party service for faxing, rather than for printing.   (*Id.*, ¶ 16).

    PrinterOn does not contend that either of these processes infringes the Password Patents.   Nor could they, as both bypass the Breezy Connector on the printer-side of the firewall.

preauthorized printing system.  The court's construction of authorization password requires the identifier to be verified on the printer side of the firewall at the point of printing, because the identifier controls or allows access to the printer.  The construction requires some verification at that point.  BreezyPrint's system does not require similar receipt and verification of a password. BreezyPrint's printer_id code is not an identifier that controls or allows access to a network resource device.  The printer_id is an identifier that helps the print job reach its preauthorized destination. BreezyPrint does not literally infringe the Password Patent claim limitation of the receipt of an authorization password in response to a poll request.

Even if the printer_id code qualified as an authorization password, BreezyPrint does not infringe either of the Password Patents for two independent reasons.  Both are analyzed below.

### ii.      The '188 Patent

The '188 Patent requires that a polling server communicate the authorization password to a "destination address," or print server.  '188 Patent, Claims 1 & 2, 14.  BreezyPrint's system does not communicate the printer_id from a polling server to a print server.  Instead, the Breezy Connector receives a print job from across the firewall and sends the job, with the printer_id code, directly to the printer.  PrinterOn argues that BreezyPrint infringes because the Breezy Connector serves as both the polling server and the print server, making the Breezy Connector two servers rather than one.  PrinterOn contends that the number of functions a software application performs determines the number of "servers" making up that software application.

PrinterOn's argument rests on its proposed construction of server, which the court rejected. The court construed server to mean "software that receives a request from other software and provides a resource in response."  The uncontroverted record evidence shows that the Breezy

Connector is a single server under that construction.  Hansen's declaration states that the Breezy Connector "is an intermediate software server" and "is not two servers."  (Docket Entry No. 129, ¶ 2).  PrinterOn's expert, Tipton Cole, does assert that the Breezy Connector has "polling server software" and "print server software."  (Docket Entry No. 70-5, at 3).  But Cole bases this conclusion on PrinterOn's function-based construction.  He relies solely on the Architectural Brochure's disclosure that the Connector "detects pending document[s]" and "sends document[s] to the printer that was selected."  (*Id.* (quoting Brochure)).  According to Cole, "[t]he first function is a polling function and the second function is that of a print server, which is software that distributes print jobs to the intended printer."  (*Id.*).  Cole does not identify how BreezyPrint's source code or its Architectural Brochure would support his conclusion under the court's construction of server.  And even if the court adopted PrinterOn's proposed construction of server, BreezyPrint does not infringe the '188 Patent.

Even if a "server" means a "service implemented by software," that does not make each service or function implemented a separate and distinct server.  The record shows that the Breezy Connector provides and runs one service:  "after a user submits a file for printing from the user's device, the Breezy Connector merely acts as an intermediary software server that relays the translated data transmitted by the Breezy Rendering Engine" to the printer.  (Docket Entry No. 39, Hansen Decl. ¶ 20).  Hansen's declaration states that the Connector "never runs as more than one service" and "does not use different services for different functions."  (Docket Entry No. 129, Hansen Suppl. Decl., ¶ 2).

PrinterOn's "two functions, two servers; three functions, three servers" approach would make calculator software that divides, multiplies, adds, and subtracts four servers, even though it

implements one service:   automated calculation.   PrinterOn's approach also appears to be inconsistent with its own Password Patents.  Claim 2 of the '188 Patent includes a polling server that performs two functions—an input interface and an output interface.  *See* '188 Patent, Claim 2.  Claim 5, a dependent claim, describes the polling-server system as "further comprising a *print server* coupled to the network printing device."  *See* '188 Patent, Claim 5 (emphasis added).   This is inconsistent with the "one function, one server, two functions, two servers" argument PrinterOn makes.  *See Karlin Tech. Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 972 (Fed. Cir. 1999).

PrinterOn argues that BreezyPrint's Architectural Overview Diagram, which shows the Breezy Connector in the BreezyPrint system, creates a factual dispute as to whether the Breezy Connector consists of two servers—a polling server and a printing server.  But the diagram shows the Breezy Connector as a single element.   PrinterOn does not identify a source code file distinguishing between the "polling server software" and "print server software."  Cole's opinion that the Breezy Connector consists of two servers does not create a factual dispute precluding summary judgment because his opinion is conclusory, does not identify specific supporting facts, and does not address the problems with the "two function, two server" approach.  *See Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 1001 (Fed. Cir. 2008) ("Conclusory expert assertions cannot raise triable issues of material fact on summary judgment."); *Davis v. Brouse McDowell, L.P.A.*, 596 F.3d 1355, 1364 (Fed. Cir. 2010); *Phillips Petroleum Co. v. Huntsman Polymers Corp.*, 157 F.3d 866, 876 (Fed. Cir.1998) (reasoning that conclusory expert declarations devoid of facts upon which the conclusions were reached fail to raise a genuine issue of material fact which would preclude summary judgment).

Even assuming that the Breezy Connector is both a polling server and a print server, it does not communicate an authorization password "to" a "destination address" because both servers have the same address—the Breezy Connector address.  There is and can be no communication from a polling server to a different print-server destination address.   PrinterOn contends that the "destination address" is the portion of the source code that executes the print-server function (as opposed to the polling-server function).  PrinterOn fails to identify where this exists in BreezyPrint's source code.   Nor does PrinterOn identify other record evidence that controverts Hansen's declaration.  PrinterOn has not raised a factual dispute on this issue.

### iii.    The '293 Patent

The '293 Patent requires "decompression to extract" an authorization password. '293 Patent, Claims 1 & 21.  Even if the printer_id code qualifies as an authorization password received in response to a poll request, BreezyPrint's system does not extract the printer_id code as part of data decompression after the application data crosses the firewall.

PrinterOn points to a BreezyPrint Architecture Brochure stating that the Breezy Connector "will by default always try to decompress a file—if decompression fails (meaning file wasn't compressed to begin with), then it will continue gracefully."  (Docket Entry No.  70 (citing brochure)).  PrinterOn does not point to evidence that links this decompression to extracting an authorization password, as set out in Claims 1 and 21 of PrinterOn's '293 Patent.  Hansen's declaration states that BreezyPrint does not decompress to extract the printer_id code or any code that PrinterOn argues functions like the authorization password as part of or during data decompression. (Docket Entry No.  129, ¶¶ 5-7).

In response, PrinterOn cites its expert's opinion that "the BreezyPrint source code and Architecture Brochure establishes that the encryption and compression functionalities of HTTP/HTTPS are present in the BreezyPrint systems." (Docket Entry No. 70-5, ¶ 12; *see also* Docket Entry No. 48-6, ¶ 26(e) (observing that "[t]he Breezy Connector decrypts and decompesses the transmission from the Breezy Cloud to extract the 'printer_id' and the print job"). Cole's opinion does not identify the basis for this conclusion. The exhibit Cole does cite to support this assertion does not disclose or describe any decompression. (Docket Entry No. 48-6, Ex. 7). He does not refer to a specific part of the Architecture Brochure or of BreezyPrint's source code. His opinion is conclusory and does not raise a genuine dispute of material fact. *See Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 1001 (Fed. Cir. 2008) ("Conclusory expert assertions cannot raise triable issues of material fact on summary judgment."); *Davis v. Brouse McDowell, L.P.A.*, 596 F.3d 1355, 1364 (Fed. Cir. 2010); *Phillips Petroleum Co. v. Huntsman Polymers Corp.*, 157 F.3d 866, 876 (Fed. Cir. 1998) (reasoning that conclusory expert declarations without the facts on which the conclusions were reached fail to raise a genuine issue of material fact precluding summary judgment).[11]

PrinterOn alternatively agues that even if the BreezyPrint system does not decrypt and decompress the application data to extract an authorization password, the system still infringes Claim 1 of the '293 Patent. PrinterOn argues that BreezyPrint's system is *capable* of decompressing the application data to extract an authorization password, and that Claim 1 requires only that the server be "configured to decrypt and decompress the application data to extract the authorization

_____

[11] In light of this conclusion, the court need not reach BreezyPrint's request to strike Paragraph 12 of Cole's supplemental declaration under Fed. R. Evid. 702; it is denied as moot. (Docket Entry No. 128, at 23-24).

password." (Docket Entry No. 70, at 13; '293 Patent, 13:3-5); *see also Intel Corp. v. ITC*, 946 F.2d 821, 832 (Fed. Cir. 1991) ("Because the language of claim 1 refers to 'programmable selection means' . . . the accused device, to be infringing, need only be capable of operating in the page mode.")).[12] PrinterOn relies on the fact that the BreezyPrint system uses HTTPS, a code form that combines Hyper Text Transfer Protocol, or HTTP, with secure socket layering, or SSL, to transmit information securely. PrinterOn argues that because "HTTPS includes two functionalities," encryption and compression, BreezyPrint's use of HTTPS infringes Claim 1 of the '293 Patent. (Docket Entry No. 70, at 14).

This argument is unpersuasive. The uncontroverted summary judgement evidence shows that the BreezyPrint system is incapable of decompression and decryption to extract an authorization password, as Claim 1 of the '293 Patent requires. BreezyPrint has submitted competent evidence from its founder and chief architect of its source code that BreezyPrint users cannot enable decompression and decryption to extract an authorization password as PrinterOn alleges. (Docket Entry No. 129, ¶¶ 8-10). The BreezyPrint source code is fixed so that it is not capable of performing the alleged infringing function. PrinterOn cites Cole's opinion that "[t]he BreezyPrint systems are, at the very least, configured to decompress the application data to extract the authorization password," (Docket Entry No. 70-5, ¶ 10), but again, Cole's assertions are conclusory. While he states that his opinion rests on the Architecture Brochure and source code, (Docket Entry

---

[12] Claim 21 (the method claim), the '293 Patent's other independent claim, does not use the "configured to" language that is in Claim 1. ('293 Patent, 14:26-27) (requiring "decompressing the application data to extract the authorization password"). *See Mirror Worlds, LLC v. Apple Inc.*, 692 F.3d 1351, 1358 (Fed. Cir. 2012) ("To infringe a method claim, all steps of the claimed method must be performed.").

No. 70-5, ¶¶ 11-12), he cites no specific provision or part.  His opinion does not raise a genuine dispute of material fact that would preclude summary judgment.  *See Sitrick, LLC*, 516 F.3d at 1001 ("Conclusory expert assertions cannot raise triable issues of material fact on summary judgment.").[13]

The case of *Fantasy Sports Properties, Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108 (Fed. Cir. 2002), shows the difference between the BreezyPrint products and an accused device that did not, but was capable of, infringing.  *Fantasy Sports* was an appeal from a summary judgment that the accused product did not infringe patents relating to awarding bonus points in fantasy sports leagues.  Although the appellant conceded that the accused product did not infringe the patent under the district court's interpretation of the "bonus points" limitation, the appellant argued that the accused product was "capable of being configured to award bonus points when a player scores out of position."  *Id.* at 1117.  The Federal Circuit agreed that summary judgment was inappropriate on the record before the district court because "the code underlying an accused fantasy football game [was] [] written in such a way as to enable a user of that software to utilize the function of awarding bonus points for unusual plays such as out-of-position scoring, without having to modify that code."  *Id.* at 1118; *see also id.* ("[I]n order to infringe the '603 patent, the code underlying an accused fantasy football game must be written in such a way as to enable a user of that software to utilize [the infringing function] without having to modify that code."); *id.* ("*Intel* therefore does not stand for the proposition, as argued by Fantasy, that infringement may be based upon a finding that an accused product is merely capable of being modified in a manner that infringes the claims of a

---

[13]  In light of this conclusion, the court need not decide BreezyPrint's motion to strike Paragraph 10 of Cole's supplemental declaration under Fed. R. Evid. 702.  (Docket Entry No.  128, at 28).  The motion is denied as moot.

patent.").  By contrast, the undisputed evidence shows that the BreezyPrint source code is fixed so that the accused product is incapable of decompression and decryption to extract an identifier.  A user cannot enable that function without modifying the source code, unlike the facts in *Fantasy Sports*.  This infringement theory fails.

BreezyPrint is entitled to summary judgment that it does not literally infringe the Password Patents.

### b.    The Doctrine of Equivalents

PrinterOn argues that BreezyPrint's use of the printer_id identifier infringes the Password Patents under the doctrine of equivalents.  BreezyPrint responds that prosecution-history estoppel precludes PrinterOn from asserting infringement on this basis.

The PTO initially rejected PrinterOn's applications for both the '188 and '293 Patents as anticipated by prior art and for obviousness.  *See* 35 U.S.C. §§ 102, 103.  PrinterOn added several claim limitations in response to the examiner's action.  PrinterOn amended the independent claims to require the receipt of an authorization password "in response to a poll request," to require "communicating" the authorization password to a destination address, and to require "decompression to extract the authorization password."  (Docket Entry No. 40, Ex. 3 at PO-000919-26, 903-15, 890-96; Ex. 4 at PO-001105-19, 1064-79).  These limitations narrowed the scope for reasons of patentability.  The *Festo* presumption applies.  *See Integrated Tech. Corp. v. Rudolph Techs., Inc.*, 734 F.3d 1352, 1357-58 (Fed. Cir. 2013) ("[P]rosecution history estoppel presumptively applies because the amendment narrowed the scope of the original claim in response to patentability rejections.").

PrinterOn contends that it did not distinguish the prior art "based on a 'printer_id'" and that this basis for infringement is therefore "beyond the 'subject matter surrendered by the narrowing amendment.'" (Docket Entry No. 48, at 25 (quoting *Pacific Coast*, 739 F.3d at 704)).  But "[i]t is not relevant to the determination of the scope of the surrender that the applicant did not need to amend the claims [as they were amended] in order to overcome the prior art."  *See Lucent Techs., Inc. v. Gateway, Inc.*, 525 F.3d 1200, 1218 (Fed. Cir. 2008); *see also Regents of Univ. of Cal. v. Dakocytomation Cal., Inc.*, 517 F.3d 1364, 1381 (Fed. Cir. 2008) ("The fact that narrowing the claim . . . may not have been necessary to distinguish over the prior art does not change the analysis.").

The PTO rejected PrinterOn's application based on prior art disclosed in Grantges (U.S. Patent No. 6,324,648) and Motoyama (U.S. Patent No. 6,581,092), and based on obviousness in light of that prior art.  Even if PrinterOn did not need to amend as broadly as it did in order to overcome the prior art, it chose the limitations it added.  *See Integrated Tech.*, 734 F.3d at 1358 ("It may be that ITC did not need to surrender a lack of physical contact between the probe tip and window in either state to overcome Sato.  The dispositive fact is that ITC chose to do so.").  The alleged infringing use of the printer_id identifier is within the subject matter PrinterOn surrendered by its amendment.

PrinterOn argues that it overcomes the *Festo* presumption because "the rationale underlying the narrowing amendment bore no more than a tangential relation to the equivalent in question." *Festo*, 344 F.3d at 1368.  "The tangential relation exception is 'very narrow.'" *Integrated*, 734 F.3d at 1358 (quoting *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 480 F.3d 1335, 1342 (Fed. Cir. 2007)).  PrinterOn must show that the "'reason for the narrowing amendment was peripheral, or not directly relevant, to the alleged equivalent.'" *Id.* (quoting *Festo*, 344 F.3d at 1369).

The Grantges and Motoyama prior art did not contain the alleged equivalent, but that does not make PrinterOn's amendments "tangential" to the equivalent. *See Integrated*, 734 F.3d at 1358; *Chimie*, 402 F.3d at 1383. In *Chimie*, the patentee asserted that "the prosecution history show[ed] that the limitation 'dust-free and non-dusting' was added to Claim 1 of the '234 patent to distinguish the invention of precipitated silica particulates from the prior art of 'powdered or granulated [or otherwise shaped] silicas.'" 402 F.3d at 1383. According to the patentee, "because the accused products [were] 'spray-dried silica microspheres' and not 'powdered or granulated silicas' they [were] not within the distinguished prior art and therefore the narrowing amendment [wa]s not directly relevant to the accused equivalents." *Id.* at 1383. The Federal Circuit rejected this argument, concluding that the patentee "misunderstands the scope of the inquiry into the relationship between the narrowing amendment and the accused equivalent." *Id.* The patentee had "amended its claim to incorporate numerous limitations identifying the specific characteristics that distinguished its invention from the prior art, including the trait that it was 'dust-free and non-dusting.'" *Id.* The patentee's "articulation of these characteristics was not limited to the form of the silica produced and therefore, Rhodia presumptively surrendered all forms of silica with dust levels too great to be considered 'dust-free and non-dusting.' As a claimed improvement over the prior art, the relative dustiness of [the patentee's] invention was at issue during prosecution and thus the reason for the narrowing amendment cannot be said to be tangential to an equivalent that has that characteristic." *Id.*

PrinterOn used the claim limitations involving the authorization password a similar way to how the patentee in *Chimie* used the added limitations of "dust-free" and "non-dusting" silica, to overcome the examiner's rejection by asserting an "improvement over the prior art." *Id.*

64

PrinterOn's response to the PTO's rejection stated that "[t]he problems with the prior art are, in part, addressed by the concept of an authorization password which is linked to the application data. . . . The authorization password is also associated with the network resource . . . to allow controlled access to the network resource."  (Docket Entry No. 40, Ex. 3; PO-000909).  This statement undermines PrinterOn's argument that its amendments to the Password Patents were tangential to the alleged equivalent.  PrinterOn has not met its burden to overcome the *Festo* presumption. PrinterOn is estopped from arguing that BreezyPrint infringes the Password Patents under the doctrine of equivalents.

BreezyPrint's motion for summary judgment of noninfringement, (Docket Entry No. 37), is granted.

### B.    PrinterOn's Motion for Summary Judgment on BreezyPrint's Tortious Interference Counterclaim (Docket Entry No. 103)

BreezyPrint counterclaimed, alleging that PrinterOn purposefully and in bad faith brought this suit to interfere with BreezyPrint's contractual relationship with Uniguest.  PrinterOn moved for summary judgment dismissing this counterclaim, arguing that federal patent law preempts this state-law cause of action and, alternatively, that the counterclaim fails as a matter of Texas state law. (Docket Entry No. 103).  Both arguments are analyzed below.

### 1.    Whether Federal Law Preempts BreezyPrint's Tortious Interference Counterclaim

"State tort claims against a patent holder, including tortious interference claims, based on enforcing a patent in the marketplace, are 'preempted' by federal patent laws, unless the claimant can show that the patent holder acted in 'bad faith' in the publication or enforcement of its patent." *800 Adept, Inc. v. Murex Securities, Ltd.*, 539 F.3d 1354, 1369 (Fed. Cir. 2008) (quoting *Zenith*

*Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1345–46 (Fed. Cir. 1999)). "'Patents would be of little value if infringers of them could not be notified of the consequences of infringement, or proceeded against in the courts.  Such action, considered by itself, cannot be said to be illegal.'" *Id.* (quoting *Virtue v. Creamery Package Mfg. Co.*, 227 U.S. 8, 37–38 (1913)).  The "'bad faith' standard has objective and subjective components. The objective component requires a showing that the infringement allegations are 'objectively baseless.'"  *Id.* at 1370 (citations omitted). "The subjective component relates to a showing that the patentee in enforcing the patent demonstrated subjective bad faith."  *Id.*

"Absent a showing that the infringement allegations are objectively baseless, it is unnecessary to reach the question of the patentee's intent."  *Id.*  "Infringement allegations are objectively baseless if 'no reasonable litigant could realistically expect success on the merits.'" *Id.* at 1370 (quoting *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 (1993)); *see also GP Indus., Inc. v. Eran Indus., Inc.*, 500 F.3d 1369, 1374 (Fed. Cir. 2007).  To prevail on its claim that PrinterOn's actions were objectively baseless, BreezyPrint must submit or identify clear and convincing evidence that PrinterOn had no reasonable basis to believe that its patent claims were valid or that BreezyPrint and Uniguest infringed its valid patents.  *Id.*; *see also Golan v. Pingel Enter., Inc.*, 310 F.3d 1360, 1371 (Fed. Cir. 2002).  "Because of the value placed on property rights, which issued patents share, and in light of the underlying jurisprudential basis for the bad faith standard, rooted as it is in Supreme Court cases and Constitutional principles, a party attempting to prove bad faith on the part of a patentee enforcing its patent rights has a heavy burden to carry."  *Id.* (citations and quotations omitted).

BreezyPrint argues that PrinterOn's infringement claims were objectively baseless because PrinterOn asserted unreasonable claim constructions, pursued litigation in the face of evidence of noninfringement, and relied on infringement grounds disclaimed during patent prosecution.[14] These are the factors courts examine in determining objective bad faith. *See MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907 (Fed. Cir. 2012); *Multi-Tech, Inc. v. Components, Inc.*, 708 F. Supp. 615 (D. Del. 1989); *Eltech Sys. Corp. v. PPG Indus., Inc.*, 903 F.2d 805 (Fed. Cir. 1990); *Eon-Net LP v. Flagstar Bancorp.*, 653 F.3d 907 (Fed. Cir. 2011); *ICU Medical, Inc. v. Alaris Medical Sys., Inc.*, 558 F.3d 1368 (Fed. Cir. 2009).

BreezyPrint identifies three examples of PrinterOn's proposed claim constructions that were objectively unreasonable:  (1) communicating something "from" a point does not require that the thing is ever at, or communicated from, that point; (2) an authorization password is anything that identifies a destination; and (3) "decompression" is any change to the form of data even if it does not affect the size or space the data occupies.  (Docket Entry No. 120, at 15-16).  The record does not contain clear and convincing evidence that these proposed claim constructions were objectively baseless.

The PrinterOn patents require communication of "translated data" from the network terminal to the network resource device.  Although this court construed this claim language to require that the data be translated before it is communicated to an intermediary server, through the firewall, and on to the printing device, that does not make PrinterOn's proposed construction unreasonable.  The

---

[14] BreezyPrint also argues that PrinterOn exhibited bad faith in imposing extortionate defense costs and engaging in litigation misconduct.  These are arguments that PrinterOn acted with subjective bad faith.  Because the court finds no objective bad faith, it need not decide whether BreezyPrint has shown that PrinterOn acted with subjective bad faith.

patents generally address a system and method for communicating translated source data from the network terminal to a printing, or network resource, device.  The data does come from the network terminal and, after translation, travels to a printer—a resource device—in print-ready format.  Under PrinterOn's proposed construction, the translated source data is communicated "from" the network terminal "to" the network resource device, at least in the sense that the untranslated data starts at the network terminal and ultimately arrives as translated data at the network resource device. Although the court adopted BreezyPrint's proposed construction—requiring the translation to occur at the network terminal before the communication occurs—as supported by the intrinsic evidence and by the ordinary meanings of "from" and "translated," the construction PrinterOn proposed was not objectively unreasonable.

The analysis is similar for the "authorization password." The court did not adopt PrinterOn's proposed meaning.  But the language in the claims and specification about "facilitation" and "providing access" are enough support for that proposed construction to prevent it from being objectively unreasonable.

Finally, PrinterOn's proposed construction of "decompression" as "returning to original form" was not objectively baseless.  When data that has been compressed is decompressed, it may "return to its original form" in all aspects.  Again, although the court found PrinterOn's proposed construction overbroad, the record does not present clear and convincing evidence that it was objectively baseless.

The analysis and conclusion are similar to the Federal Circuit's approach in *iLOR, LLC v. Google, Inc.*, 631 F.3d 1372 (Fed. Cir. 2011).  The Federal Circuit concluded that the defendant "had not met its high burden to show by clear and convincing evidence that [the] suit was brought

frivolously or that iLOR's position on claim construction was objectively baseless" because the claim language did not "[o]n its face . . . preclude the patentee's construction" and the "specification [did not] clearly refute the patentee's construction." *Id.* at 1378.  Similarly, although PrinterOn relied heavily on extrinsic evidence, including the opinions of its expert, Tipton Cole, PrinterOn did not ignore the intrinsic evidence.  PrinterOn also argued that its proposed constructions found support in the claim language, the Canadian Priority Application, and the specification.  Neither the claim language nor the specification obviously precluded or refuted PrinterOn's proposed constructions.  *See id.* ("Claim interpretation is not always an exact science, and it is not unusual for parties to offer competing definitions of even the simplest claim language." (quotation omitted)).

BreezyPrint argues that once PrinterOn had access to its source code, it had clear evidence of noninfringement and should not have continued the litigation.  But this argument rests on BreezyPrint's assertion that PrinterOn's claim constructions were objectively unreasonable.  If the court had adopted many of PrinterOn's proposed constructions, the infringement analysis and result would have changed.  BreezyPrint cites *Eon-Net*, 653 F.3d at 1326, but that case is distinguishable because the "written description" in that patent "clearly" refuted the plaintiff's claim construction. 653 F.3d at 1326.

Nor did PrinterOn exclusively or clearly rely on infringement theories that it expressly disclaimed during prosecution history.  BreezyPrint argues that PrinterOn disclaimed the use of indirect communication, such as communication over an insecure public network.  (Docket Entry No. 120, at 16).  But even after PrinterOn's amendments, the PTO-approved claim language contemplates both public and private access.  *See* '093 Patent, Claim 9 (public access), Claim 10 (private access), Claim 16 (public access), and Claim 17 (private access).

69

The prosecution-history estoppel cases BreezyPrint relies on to show objectively baseless claim construction are distinguishable.  In *MarcTec*, the patentee's "proposed claim construction . . . *ignored the entirety* of the specification and the prosecution history."  664 F.3d at 918 (emphasis added).  The *MarcTec* patentee had clearly disclaimed stents during the patent prosecution, yet asserted that the defendant's Cypher stent infringed.  *See id.*  Similarly, in *Multi-Tech*, "the well-documented prosecution history . . . indicate[d] *unequivocally* that thermoplastic materials were excluded from the scope of the patent."  708 F. Supp. at 622 (emphasis added).  The court emphasized that "Multi–Tech was granted its patent based on its representations that its invention concerned only thermosettable material—material that once set and molded by application of heat can not be remolded.  For Multi–Tech to argue in this litigation that the terms thermosettable and thermoset were merely descriptive terms that could include thermoplastic materials is incongruous."  *Id.*

Because PrinterOn's infringement contentions and claim constructions were not objectively baseless, BreezyPrint's tortious interference counterclaim is preempted by federal law.[15]  PrinterOn's motion for summary judgment on the counterclaim, (Docket Entry No. 103), is granted.

### 2.    Whether BreezyPrint's Counterclaim Fails as a Matter of State Law

Even if federal law does not preempt BreezyPrint's state-law counterclaim, it fails as a matter of state law.

The parties first dispute the state law that applies.  PrinterOn contends that Texas law applies because BreezyPrint based its tortious-interference counterclaim on this lawsuit and on PrinterOn's

---

[15]  BreezyPrint's request for additional discovery into PrinterOn's subjective bad faith is denied as moot in light of the court's conclusion that PrinterOn's claims were not objectively baseless.

settlement agreement with Uniguest, which is governed by Texas law.  (Docket Entry No. 103, at 15 n.2).  BreezyPrint argues that because its contractual relationship with Uniguest was based in California, that state's law applies even though the counterclaim was filed in a Texas federal court.

"'A federal court must follow the choice-of-law rules of the state in which it sits.'"  *Fina, Inc. v. ARCO*, 200 F.3d 266, 269 (5th Cir. 2000) (quoting *St. Paul Mercury Ins. Co. v. Lexington Ins. Co.*, 78 F.3d 202, 205 (5th Cir. 1996)).  "For both tort and contract cases, Texas follows the 'most significant relationship test' set out in the Restatement (Second) of Conflict of Laws § 6 and § 145."  *DTEX, LLC*, 508 F.3d at 802 (citing *Torrington Co. v. Stutzman*, 46 S.W.3d 848 (Tex. 2000); *Guiterrez v. Collins*, 583 S.W.2d 312, 318 (Tex. 1979)).  "Some relevant factors to consider include: (a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and the place where the relationship, if any, between the parties is centered."  *Id.* (quotations and alteration omitted); *see also* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145.

"The relative importance of the contacts mentioned above varies somewhat with the nature of the tort involved."  RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 cmt. (f).  Although "the place of injury is of particular importance in the case of personal injuries and of injuries to tangible things" and "in the case of false imprisonment and of malicious prosecution and abuse of process," "the place of injury is less significant in the case of fraudulent misrepresentations and of such unfair competition as consists of false advertising and the misappropriation of trade values."  *Id.* (citations omitted).  This is because "the effect of the loss, which is pecuniary in its nature, will normally be felt most severely at the plaintiff's headquarters or principal place of business.  But this

71

place may have only a slight relationship to the defendant's activities and to the plaintiff's loss of customers or trade." *Id.*

BreezyPrint alleged that PrinterOn interfered with a contract executed in California that contained a California choice-of-law provision. BreezyPrint also alleged that it felt the pecuniary injury most severely in California, where its headquarters are located. But California has only a "slight relationship" to PrinterOn's allegedly tortious conduct in Texas. PrinterOn sued BreezyPrint and Uniguest in the Southern District of Texas, negotiated a settlement agreement with Uniguest in Texas, and signed a settlement agreement with Uniguest providing for the application of Texas law. BreezyPrint's financial injuries from tortious interference are like those stemming from unfair competition and misappropriation, making the place of injury less relevant than in a case involving personal injury or property damage. Texas has the most significant relationship to PrinterOn's alleged tortious conduct. *See MGE UPS Sys., Inc. v. Fakouri Elec. Eng'g, Inc.*, 422 F. Supp. 2d 724, 739-40 (N.D. Tex. 2006) (applying Texas law, rather than California law, to a tortious-interference claim even though both parties were "California corporations," because "the gravamen" of the plaintiff's tortious-interference allegations relating to the acquisition of "proprietary" software code "occurred in Texas"); *Quicksilver Resources, Inc. v. Eagle Drilling, LLC*, 792 F. Supp. 2d 948, 957 (S.D. Tex. 2011) (applying Texas law, rather than Oklahoma law, to a tortious-interference claim because "[t]he operation of the conspiracy occurred in Texas where all of the individual defendants were located," and "[t]he significance of these contacts in relation to the issues underlying these tort claims ma[de] the location of the conduct outweigh the location of the injury," which was "based solely on [the Oklahoma party's] domicile, a factor in and of itself"); *Eisenstadt v. Telephone Elecs. Corp.*, No. 3:06-CV-1196-O, 2008 WL 4452999, at *8 (N.D. Tex. Sept. 28, 2008) (applying "Texas

law to Plaintiffs' claim for tortious interference with a business opportunity" despite "California['s] [] relevant contacts" because "a resident of Texas [was] accused of committing a tort while in the state of Texas" and "both the state of Texas and the resident would reasonably expect the resident defendant would be judged pursuant to the laws of Texas").

To establish a claim for tortious interference with an existing contract under Texas law, BreezyPrint must show "(1) the existence of a contract subject to interference, (2) willful and intentional interference, (3) that proximately causes damage, and (4) actual damage or loss." *All Am. Tel., Inc. v. USLD Commc'ns, Inc.*, 291 S.W.3d 518, 531 (Tex. App. –Fort Worth 2009, pet. denied). "For a plaintiff to maintain a tortious interference claim, it must produce some evidence that the defendant knowingly induced one of the contracting parties to breach its obligations under the contract." *Id.* at 532. "The plaintiff must present evidence that a contract provision was breached." *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 674–75 (S.D. Tex. 2010) (citing *N.Y. Life Ins. Co. v. Miller*, 114 S.W.3d 114, 125 (Tex. App. –Austin 2003, no pet.)); *Archives of Am., Inc. v. Archive Litig. Servs., Inc.*, 992 S.W.2d 665, 667–68 (Tex. App. –Texarkana 1999, pet. denied). "Like contract interpretation, tortious interference with contract is a mixed question of law and fact." *Ham Marine, Inc. v. Dresser Indus., Inc.*, 72 F.3d 454, 461 (5th Cir. 1995).

BreezyPrint's contract with Uniguest included a "Termination for Convenience" provision, which allowed "either party" to "terminate this Agreement at any time by providing the other party with at least thirty (30) days' prior written notice of such election to terminate." (Docket Entry No. 103, Ex. A, ¶ 13(c)). When Uniguest ended its relationship with BreezyPrint after settling with

PrinterOn, Uniguest did not breach its contract with BreezyPrint.[16]  A reasonable jury could not find that PrinterOn knowingly induced Uniguest to "breach its obligations under the contract."  *Rimkus*, 688 F. Supp. 2d at 674-75; *see also Funes v. Villatoro*, 352 S.W.3d 200, 213 (Tex. App.–Houston [14th Dist.] 2011, no pet.); *Newspaper Holdings, Inc. v. Crazy Hotel Assisted Living, Ltd.*, 416 S.W.3d 71, 87 (Tex. App.–Houston [1st Dist.] 2013, pet. denied) ("[M]erely inducing a contract obligor to do what it has a right to do is not actionable interference.").

BreezyPrint argues that "the terminable-at-will status of a contract is no defense to an action for tortious interference with its performance," quoting *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 689 (Tex. 1989).  But more recent Texas Supreme Court authority has held otherwise.  *See ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997) ("Ordinarily, merely inducing a contract obligor to do what it has a right to do is not actionable interference.").  Courts have limited *Sterner* to cases involving at-will employment contracts and to alleged interference that was either defamatory or that breached an independent contract obligation.  As the court observed in *Lazer Spot, Inc. v. Hiring Partners, Inc.*, 387 S.W.3d 40, 52 (Tex. App.–Texarkana 2012, reh'g pet. denied):

> "Although [*Sterner*'s] holding seems to contradict the holding in *ACS Investors*[, 943 S.W.2d 426], it might be distinguishable by the fact that Marathon's contract with Sterner's employer specifically yielded all managerial decisions to the employer. Marathon induced the employer to do what it had a right to do (i.e., terminate at will).  In this case, however, Marathon breached its contract with Sterner's employer by making a demand that violated the terms of the Marathon-employer agreement. Marathon's acts violated its agreement with Sterner's employer and thus exceeded its right to interfere with the contract between Sterner and his employer."

---

[16]  BreezyPrint does not contend that Uniguest violated the termination provision's 30-day notice requirement.

*Id.* at 52 (quoting and removing footnotes from Sean Farrell, *Applying Tortious Interference Claims to At-Will Contracts*, 39 TEX. J. BUS. L. 527, 532 (2004))); *see also id.* ("Outside of the realm of allegedly defamatory statements made by third parties that result in termination of at-will employment (where inducement is apparently tortious because it is accomplished via defamation), other actionable interference appears to hinge on violation of a contractual provision, other than the at-will provision." (citing *Sterner*)).

Assuming that federal patent law does not preempt BreezyPrint's tortious interference counterclaim, PrinterOn is nonetheless entitled to summary judgment dismissing the counterclaim.

### C.      BreezyPrint's Motion for Sanctions (Docket Entry No. 152)

BreezyPrint has moved for an award of its attorney's fees as a sanction against PrinterOn. BreezyPrint invokes Federal Rule of Civil Procedure 11, 28 U.S.C. § 1927, and the court's inherent authority.  (Docket Entry No. 152).  BreezyPrint contends that PrinterOn:  (1) failed to engage in a reasonable investigation of BreezyPrint's accused products before suing for patent infringement; (2) relied on unreasonable claim-construction theories; (3) shifted its infringement allegations and claim constructions to respond evidence that BreezyPrint did not infringe; (4) vexatiously multiplied case proceedings; and (5) misrepresented case law in court filings.

Each asserted basis for sanctions is analyzed below.

### 1.      Rule 11 Sanctions

Rule 11 sanctions may not be imposed unless conduct was objectively unreasonable under the circumstances. *Thomas v. Capital Sec. Servs., Inc.*, 836 F.2d 866, 873 (5th Cir. 1988).  A district court has broad discretion in determining whether any sanction is warranted and, if so, what it should be.  *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 404 (1990).

Rule 11 generally requires an attorney to make a reasonable inquiry into the law and facts before signing and filing pleadings, written motions, or other documents.  The Rule prohibits filings made with "any improper purpose," the offering of "frivolous" arguments, and the assertion of factual allegations without "evidentiary support" or the "likely" prospect of such support.  FED. R. CIV. P. 11(a)-(c);  *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 33, 39 (1st Cir. 2005); *see also FDIC v. Maxxam, Inc.*, 523 F.3d 566, 577 (5th Cir. 2008).  Signing a pleading, motion, or other filing certifies "that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," the filing does not violate one of the Rule 11 prohibitions. FED. R. CIV. P. 11(b).  A legal contention or argument is not frivolous if warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or establishing new law.  FED. R. CIV. P. 11(b)(2).[17]

---

[17]  Rule 11(b) provides:

(b) Representations to Court. By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

Deciding Rule 11 motions often involves "fact-intensive, close calls." *Cooter & Gell*, 496 U.S. at 404 (quotations omitted); *Clark v. United Parcel Serv., Inc.*, 460 F.3d 1004 (8th Cir. 2006). The test for imposing Rule 11 sanctions is whether the attorney's conduct was objectively unreasonable under the circumstances. *See Thomas v. Capital Sec. Servs., Inc.*, 836 F.2d 866, 873 (5th Cir. 1988). The rule "establishes an objective standard, intended to eliminate any 'empty-head pure-heart' justification for patently frivolous arguments." FED. R. CIV. P. 11 Advisory Committee Notes (1993 amendments); *Tahfs v. Proctor*, 316 F.3d 584, 594 (6th Cir. 2003) ("A good faith belief in the merits of a case is insufficient to avoid sanctions.").

In patent infringement suits, "Rule 11 . . . require[s] the [lawyer] to, at a bare minimum, apply the claims of each and every patent that is being brought into the lawsuit to an accused device and conclude that there is a reasonable basis for a finding of infringement of at least one claim of each patent so asserted. The presence of an infringement analysis plays the key role in determining the reasonableness of the pre-filing inquiry made in a patent infringement case under Rule 11." *View Engineering, Inc. v. Robotic Vision Sys., Inc.*, 208 F.3d 981, 986 (Fed. Cir. 2000). "In bringing a claim of infringement, the patent holder, if challenged, must be prepared to demonstrate to both the court and the alleged infringer exactly why it believed before filing the claim that it had a

---

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

FED. R. CIV. P. 11(b).

Rule 11 requires the party seeking sanctions to follow a specific procedure. Rule 11(c)(1)(A) requires that party to serve the Rule 11 motion on the opposing party at least 21 days before filing the motion with the district court. The motion may be filed if the offending filing is not withdrawn or corrected within the 21-day "safe harbor." FED. R. CIV. P. 11(c)(1)(A). PrinterOn does not dispute that BreezyPrint complied with the safe-harbor notice requirement.

reasonable chance of proving infringement." *Id.* "Once a litigant moves based upon non-frivolous allegations for a Rule 11 sanction, the burden of proof shifts to the non-movant to show it made a reasonable pre-suit inquiry into its claim." *Digeo, Inc. v. Audible, Inc.*, 505 F.3d 1362, 1368 (Fed. Cir. 2007) (citing *View Eng'g*, 208 F.3d at 986). "[A]n attorney violates Rule 11(b)(3) when an objectively reasonable attorney would not believe, based on some actual evidence uncovered during the prefiling investigation, that each claim limitation reads on the accused device either literally or under the doctrine of equivalents." *Antonious v. Spalding & Evenflo Companies, Inc.*, 275 F.3d 1066, 1074 (Fed. Cir. 2002). Rule 11 sanctions recognize both the need to enforce ethical standards and the importance of rigorous advocacy. Imposing sanctions requires both "restraint and discretion." *Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d 323, 334 (2d Cir. 1999).

BreezyPrint contends that PrinterOn's attorneys violated Rule 11 by failing to conduct an adequate prefiling investigation. BreezyPrint argues that PrinterOn's original infringement contentions show no meaningful attempt to understand BreezyPrint's product and its differences from PrinterOn's patented system.

PrinterOn has met its burden of showing an objectively reasonable presuit investigation so as to avoid sanctions on this basis. An investigation must, at a minimum, "interpret the asserted patent claims and compare the accused device with those claims before filing a claim alleging infringement." *Q-Pharma, Inc. v. Andrew Jergens Co.*, 360 F.3d 1295, 1300-01 (Fed. Cir. 2004). The record shows that PrinterOn began its investigation by "monitor[ing] BreezyPrint's activity in the market, including periodically checking BreezyPrint's website and press releases, and investigating BreezyPrint's technology by collecting and reviewing publicly available technical materials." (Docket Entry No. 175, at 5, & Ex. 2). PrinterOn discovered that some of its former

employees and associates were working full-time for BreezyPrint and that BreezyPrint had embedded "printeron" metatags in the iTunes App Store so that any user searching for "PrinterOn" would also find "BreezyPrint." (*See id.*). PrinterOn's attorney also "compiled and studied publicly available technical literature on BreezyPrint's and Uniguest's products, which included text descriptions of how they function, drawings demonstrating the flow of information, and videos uploaded to YouTube by BreezyPrint and third parties showing certain screen shots and operations using BreezyPrint's downloadable smartphone application." (*Id.* at 7 & Ex. 1, ¶ 5). PrinterOn compared its patent claims against the publicly available information about BreezyPrint's product, and based its prefiling infringement contentions on this research and work. Unlike the defendant in *View Engineering, Inc. v. Robotic Vision Systems, Inc.*, 208 F.3d 981, 984 (Fed. Cir. 2000), which "admit[ted] that it had no factual basis for its counterclaims," PrinterOn's prefiling investigation was meaningful.

BreezyPrint asserts that its software has been available for years for free public download, and that PrinterOn could have discovered the absence of infringement before filing suit. But the record does not show that PrinterOn had access to BreezyPrint's source code before the litigation. When BreezyPrint did produce its source code in discovery, it was under a three-tiered protective order. (Docket Entry No. 31). PrinterOn did not have access to the source code later produced in discovery when it did its presuit investigation.

BreezyPrint argues that PrinterOn's failure to download its publicly available app and to try to reverse engineer that software before filing this lawsuit proves inadequate prefiling investigation. There are cases holding that sanctions may be appropriate if a plaintiff or its counsel does not download publicly available information, such as software, necessary to compare products suspected

of infringing with the patent claims.  *See, e.g.*, *Judin v. United States*, 110 F.3d 780, 784 (Fed. Cir. 1997) (holding that the trial court abused its discretion in denying a sanctions motion when the record showed that neither the plaintiff nor his counsel had "obtain[ed], or attempted to obtain, a sample of the accused device . . . so that its actual design and functioning could be compared with the claims of the patent"); *Smart Options, LLC v. Jump Rope, Inc.*, No. 12 C 2498, 2013 WL 500861 (N.D. Ill. Feb. 11, 2013) (imposing sanctions when the patentee had failed to download the alleged infringer's application before filing suit).[18]  But neither downloading an app nor reverse engineering, without access to source code, are bright-line requirements.  *See Intamin Ltd. v. Magnetar Techs., Corp.*, 483 F.3d 1328, 1338 (Fed Cir. 2007) ("*Judin* did not create a blanket rule that a patentee must obtain and thoroughly deconstruct a sample of a defendant's product to avoid violating Rule 11.").  Rather, "the key factor in determining whether a patentee performed a reasonable pre-filing inquiry is the presence of an infringement analysis," which "can simply consist of a good faith, informed comparison of the claims of a patent against the accused subject matter."  *Q-Pharma*, 360 F.3d at 1302 (affirming the district court's denial of sanctions on a patentee who "could have easily performed a chemical analysis of the accused product" but did not do so).

PrinterOn's investigation included obtaining publicly available information about BreezyPrint and comparing the BreezyPrint product to PrinterOn's Driver and Password Patent claims.  PrinterOn's initial infringement contentions were not objectively unreasonable in light of

---

[18]  The record is unclear whether PrinterOn downloaded the Breezy Mobile App before filing suit.  PrinterOn has moved for leave to file a surresponse contesting BreezyPrint's assertions that PrinterOn never downloaded the app before filing suit.  (Docket Entry No. 185).  BreezyPrint opposes the motion, arguing that surresponses (particularly those introducing new evidence) are disfavored and that BreezyPrint should be granted leave to file a surreply if the court grants PrinterOn's motion.  Because PrinterOn's prefiling investigation and infringement contentions were objectively reasonable even without considering its proposed surresponse, the court denies PrinterOn's motion, (Docket Entry No. 185), as moot.

the publicly available information and the research PrinterOn did.  Reverse engineering was not

required.[19]  PrinterOn's infringement contentions, proposed claim constructions, and opposition to

BreezyPrint's summary judgment motions did not "border on the illogical."  *Eon-Net LP*, 653 F.3d

at 1329.  The court's analysis of PrinterOn's motion for summary judgment on BreezyPrint's

tortious-interference counterclaim sets out in detail the bases for concluding that PrinterOn's

proposed claim construction and infringement allegations were not "objectively baseless."  (*See*

*infra* Part III.C.1 above.)  That analysis also shows that sanctions are unwarranted.

BreezyPrint's arguments in favor of sanctions presume that its claim constructions were the

only reasonable ones.  As noted, "[c]laim interpretation is not always an exact science."  *Q-Pharma*,

360 F.3d at 1301.  PrinterOn's "claim interpretation[s], while broad, followed the standard canons

of claim construction and [were] reasonably supported by the intrinsic record," particularly given

the parties' dispute over the Canadian Priority Application's relevance.  *Id.*  PrinterOn's

infringement contentions, which were based on its proposed claim constructions and the publicly

available information about how BreezyPrint's product worked, were not objectively unreasonable.

The fact that PrinterOn's claim-construction theories changed over the course of the

litigation do not make its initial or subsequent constructions unreasonable in light of the information

available at the time.  Such changes are common as litigation proceeds and as discovery and motion

---

[19]  *See Intamin*, 483 F.3d at 1338; *GN Resound A/S v. Callpod, Inc.*, 2013 WL 5443046, at *3 (N.D. Cal. Sept. 30, 2013) (the patentee was not "required to test the Accused Products prior to filing suit"); *Smart Options*, 2013 WL 500861, at *5 ("the law does not require that every patent-holder obtain an alleged infringer's product before bringing suit" even though it "is an effective way to assess potential infringement"); *Centillon Data Sys., LLC v. Convergys Corp.*, No. 104CV0073LJM–WTL, 2006 WL 20777, at *4 (S.D. Ind. Jan.4, 2006) ("Whether the patent holder must obtain the product an[d] analyze it . . . depends on the circumstances surrounding the pre-filing infringement analysis.").

practice provide more information on both the law and the facts.  *See Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersysteme GmbH*, 603 F.3d 943, 959 (Fed. Cir. 2010) ("A decision by a party to narrow its case for presentation to a jury does not generally suggest manipulation of the litigation process, and we see nothing improper in Medtronic's decision to narrow its infringement claim in this case."); *Abbott Point of Care, Inc. v. Epocal, Inc.*, 908 F. Supp. 2d 1231 (N.D. Ala. 2012) ("Abbott also did not engage in litigation misconduct by changing its litigation strategy after receiving an unfavorable claim construction ruling."); *cf. Lava Trading, Inc. v. Sonic Trading Management, LLC*, 445 F.3d 1348, 1353 (Fed. Cir. 2006) (holding that a party was not judicially estopped "from departing from a claim construction theory unsuccessfully advocated before the trial court").

The court finds that PrinterOn conducted an adequate prefiling investigation and advanced claim-construction theories and infringement contentions that were not objectively unreasonable. Rule 11 sanctions are not warranted.

## 2.   28 U.S.C. § 1927

A district court may impose reasonable fees on "[a]ny attorney . . . who . . . multiplies the proceedings in any case unreasonably and vexatiously." 28 U.S.C. § 1927.  These fees may be imposed only on offending attorneys, not their clients.  *Procter & Gamble Co.*, 280 F.3d at 525; *see also Travelers Ins. Co. v. St. Jude Hosp. of Kenner, La., Inc.*, 38 F.3d 1414, 1416 (5th Cir. 1994). A district court must find that the attorney multiplied the proceedings both "unreasonably" and "vexatiously." *Procter & Gamble Co.,* 280 F.3d at 525.  This requires "evidence of bad faith, improper motive, or reckless disregard of the duty owed to the court." *Edwards v. Gen. Motors Corp.*, 153 F.3d 242, 246 (5th Cir. 1998).

82

Section 1927 authorizes shifting only fees associated with "the persistent prosecution of a meritless claim." *Browning v. Kramer*, 931 F.2d 340, 345 (5th Cir. 1991) (quoting *Thomas v. Capital Sec. Serv., Inc.*, 836 F.2d 866, 875 (5th Cir. 1988)). "To shift the entire cost of defense, the claimant must prove, by clear and convincing evidence, that *every facet* of the litigation was patently meritless, . . . and counsel must have lacked a reason to file the suit and must wrongfully have persisted in its prosecution through discovery, pre-trial motions, and trial . . . ." *Procter & Gamble Co.*, 280 F.3d at 526 (citations omitted); *Vanderhoff v. Pacheco*, 344 F. App'x 22, 27 (5th Cir. 2009) (summary calendar) (unpublished). "[S]anctions may not be imposed for mere negligence on the part of counsel." *Baulch v. Johns*, 70 F.3d 813, 817 (5th Cir. 1995). Because of § 1927's punitive nature, it is strictly construed. *See id.*

The court's analysis concluding that BreezyPrint is not entitled to its attorney's fees as a Rule 11 sanction against PrinterOn also explains why shifting fees under § 1927 is unwarranted. Section 1927, unlike Rule 11, is not about negligence. *See Schwartz v. Millon Air, Inc.*, 341 F.3d 1220, 1225 (11th Cir. 2003). Rule 11 sanctions can be imposed based on a lower culpability standard than § 1927 requires. Rule 11 allows sanctions for objectively unreasonable investigation and filings, but also provides the 21-day safe harbor to allow withdrawal of a challenged filing. *See* FED. R. CIV. P. 11(c)(2). Section 1927, by contrast, requires intentionally wrongful or reckless acts by counsel and provides no safe harbor. *Vanderhoff*, 344 F. App'x at 28. PrinterOn's claim constructions were not ultimately successful, but that is not the test. BreezyPrint has failed to show by clear and convincing evidence that PrinterOn's counsel acted with bad faith, improper motive, or reckless disregard to its duty to the court. *See Lawyers Title Ins. Corp. v. DoubleTree Partners,*

*LP*, 739 F.3d 848, 872 (5th Cir. 2014).   Section 1927 sanctions on PrinterOn's counsel are unwarranted.

### 3.       Inherent Authority

"When a party's deplorable conduct is not effectively sanctionable pursuant to an existing rule or statute, it is appropriate for a district court to rely on its inherent power to impose sanctions." *Carroll v. The Jaques Admiralty Law Firm, P.C.*, 110 F.3d 290, 292 (5th Cir. 1997) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991)); *Klein v. Stahl GMBH & Co. Maschinefabrik*, 185 F.3d 98, 108 (3d Cir. 1999) ("[A] trial court should consider invoking its inherent sanctioning powers only where no sanction established by the Federal Rules or a pertinent statute is 'up to the task' of remedying the damage done by a litigant's malfeasance . . . ."). This inherent power includes the power to award attorney's fees "in narrowly defined circumstances." *Chambers*, 501 U.S. at 45 (quoting *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 765 (1980)). "Because of their very potency, inherent powers must be exercised with restraint and discretion." *Id.* at 44 (citing *Roadway Express*, 447 U.S. at 764); *cf.* 5A FEDERAL PRACTICE & PROCEDURE § 1336.3 ("A significant number of courts held that the sanctions imposed by the district judge should be the least severe necessary to serve the purposes of Rule 11.").

A court's inherent power "is not a broad reservoir of power, ready at an imperial hand, but a limited source; an implied power squeezed from the need to make the court function." *FDIC v. Maxxam, Inc.*, 523 F.3d 566, 591 (5th Cir. 2008) (quoting *NASCO, Inc. v. Calcasieu Television & Radio, Inc.*, 894 F.2d F.2d 696, 702 (5th Cir. 1990)). This inherent power is available only if statutes or rules do not address the conduct and "only if essential to preserve the authority of the court." *In re FEMA Trailer Formaldehyde Prods. Liability*, 401 F. App'x 877, 883 (5th Cir. 2010)

(quoting *Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 86 F.3d 464, 467 (5th Cir. 1996)).  "A court should invoke its inherent power to award attorney's fees only when it finds that 'fraud has been practiced upon it, or that the very temple of justice has been defiled.'"  *Boland Marine & Mfg. Co. v. Rihner*, 41 F.3d 997, 1005 (5th Cir. 1995) (quoting *Chambers*, 501 U.S. at 46).

There is no basis in the record to award attorney's fees under this court's inherent authority. Rule 11 and § 1927 address the conduct BreezyPrint challenges.  The fact that BreezyPrint invoked a specific rule and statute addressing the challenged conduct makes reliance on inherent authority inappropriate.  And BreezyPrint has not demonstrated that PrinterOn practiced a fraud on this court or that "the very temple of justice has been defiled."  *Boland Marine*, 41 F.3d at 1005 (quoting *Chambers*, 501 U.S. at 46).

BreezyPrint's motion for sanctions, (Docket Entry No. 152), is denied.

### D.    The Remaining Motions

Given the court's ruling that BreezyPrint is entitled to summary judgment of noninfringement, the court need not decide BreezyPrint's motion for summary judgment for invalidity, (Docket Entry No. 109); PrinterOn's motion for summary judgment on BreezyPrint's unclean hands defense, (Docket Entry No. 99); and BreezyPrint's motion to defer a decision on that motion, (Docket Entry No. 101).  These motions are denied as moot.

## V.    Conclusion

The court:

1.    grants BreezyPrint's motion for summary judgment of noninfringement of the Driver Patents, (Docket Entry No. 32);

2.      grants BreezyPrint's motion for summary judgment of noninfringement of the Polling-Password Patents, (Docket Entry No. 37);

3.      grants PrinterOn's motion for summary judgment on BreezyPrint's tortious interference counterclaim, (Docket Entry No. 103);

4.      denies BreezyPrint's motion for sanctions, (Docket Entry No. 152);

5.      denies as moot PrinterOn's motion for leave to file a surresponse, (Docket Entry No. 185); and

6.      denies as moot BreezyPrint's motion for summary judgment for invalidity, (Docket Entry No. 109), PrinterOn's motion for summary judgment on BreezyPrint's unclean hands defense, (Docket Entry No. 99), and BreezyPrint's motion to defer a decision on that motion, (Docket Entry No. 101).

By **March 27, 2015**, the parties must either file a statement identifying any issues that remain to be resolved and a proposed schedule for doing so or submit a proposed form of final judgment.

SIGNED on March 19, 2015, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

86